HARDY *v.* THE RALEIGH AND THE NIAGARA.

(*Circuit Court, S. D. New York.* December 3, 1890.)

**1. COLLISION—FOG—TUGS WITH TOWS AT ANCHOR—SIGNALS.**
 The tug N., with a tow, anchored in mid-stream in the Hudson river on account of fog, about 2 o'clock in the morning. The tow of canal-boats stretched abaft the tug about 800 or 1,000 feet in the channel. The N. sounded the required fog-signals, but no others were sounded, though the E., another tug, which was the N.'s helper, was stationed about the middle of the tow. Shortly after coming to anchor, a steamer coming down the river ran into and sank one of the canal-boats. *Held,* that the N., as principal, was in fault in not requiring fog-signals to be sounded on the E., her helper, which would have enabled passing vessels to locate the tow.

**2. SAME—EXCESSIVE SPEED.**
 The steamer was likewise in fault, as she was steaming from four to five knots, which was an excessive speed in the fog in question, through which vessels could not be seen at a greater distance than 50 feet.

**3. SAME—CANAL-BOAT AT ANCHOR—SIGNALS.**
 The canal-boat which was sunk, being the outside boat of the first tier of the flotilla, was likewise in fault for not sounding any signals, under the statute which prescribes that "canal-boats which shall be anchored or moored in * * * the channel of any * * * river * * * shall sound a fog-horn or equivalent signal."

In Admiralty.

*Mr. Hyland*, for libelant.

*Edward L. Owen*, for the Niagara.

*E. P. Wheeler*, for the Raleigh.

WALLACE, J. The libelant's canal-boat J. E. Heaton was sunk by a collision with the steam-boat Raleigh, which took place in the Hudson river, a little below Inglewood dock, after sunrise, and about half past 5 o'clock in the morning of May 8, 1889. The canal-boat was at the time the port vessel of the first tier of a flotilla of canal-boats which had been brought in tow of the steam-boat Niagara from Albany, bound for New York city. The flotilla was composed of six tiers of canal-boats. Owing to a dense fog, the Niagara brought her tows to anchor at about 2 o'clock A. M., near the mid-channel of the river, and kept them there until the collision took place. At the time of the collision the tide was running slightly flood in the middle of the river, and the Niagara was headed down the river southerly, and somewhat easterly, and her tows were behind her, stretching in a northerly or north-westerly line up the river. The first tier of tows was about 250 feet distant from the Niagara on a hawser, and the other tows were connected with the first by hawser. The tug Easton, which was under the control of the Niagara, and was her helper on the voyage, was stationed on the port side of the fourth tier of tows. The Raleigh had left Inglewood dock to proceed down the river to New York. As the tide in shore was running a little ebb, she had made her landing by going below and rounding up to the dock. Upon leaving the dock she started in a south-easterly direction, and gradually rounded towards the south as she crossed the river, until she headed down the river, when she took a south-westerly course, to reach the westerly side of the channel. While on this latter course, and when going at a speed of four or five knots an hour, she struck the libelant's canal-boat on the latter's port side. The fog was so dense at the time that vessels could not see one another further than about 50 feet away. The proper fog-signals were maintained on board the Niagara during the time she and her flotilla lay at anchor, but no fog-signals were given on board the tug Easton, or on the libelant's canal-boat, or on any of the canal-boats of the flotilla, nor were any ordered to be given on the tug or tows by the Niagara. The Raleigh maintained proper fog-signals on her part during all her movements. She also reversed her engines as soon as she discovered the canal-boat. The libelant went down with his boat, and was rescued in an unconscious state, and in consequence of the shock and exposure his health was permanently impaired. The district court decreed for the libelant $2,175.13 for the loss of his boat, cargo, and personal effects, together with $5,000 for his personal injuries, and condemned each of the steamers to pay half of the decree, and such part of the other's half as might not be collected. The owners of both steam-boats have appealed.

The district judge held the Niagara in fault because no fog-signals were given by her helper, the Easton. He held the Raleigh in fault for continuing her navigation from Inglewood dock in so dense a fog in a

river where other vessels were liable to be encountered, and also because her speed was excessive under the circumstances of the case.

It is not necessary to discuss the question whether the Raleigh was justified in leaving her dock, and attempting to proceed on her trip, in the dense fog that prevailed. In the present case, that question involves merely an abstract proposition. It is enough to establish her liability that she was proceeding at a speed under which she could not, by any degree of promptitude and skill, avoid a collision by reversing her engines within the distance at which she could discover approaching or stationery vessels. The rule is that such speed only is lawful or moderate speed in a fog as will permit a steamer seasonably and effectually to avoid a collision by slacking speed, or by stopping and reversing, within the distance at which another vessel can be seen. If this rule is a severe one, and practically requires a steam-ship to come to a stop, and remain stopped, when navigating a river having an extensive commerce, or in a crowded harbor, it is too well established to be disregarded.

Inasmuch as the Niagara was a principal, and the tug Easton was her servant, the former is chargeable with fault, as between the Raleigh and herself and the libelant and herself, if proper fog-signals were not given on board the Easton. In respect to the Raleigh, the Niagara is also chargeable with fault if such fog-signals were not maintained on board the tows, as reasonable care demanded, in view of the particular location and arrangement of the flotilla. The tows, being without motive power of their own, were under the control of the Niagara in respect to the place selected for anchorage, and the manner in which they should be deployed and arranged while lying at anchor in mid-river, and any failure of the Niagara to observe proper care on her own part in these particulars would be a breach of duty to other vessels navigating the river, as well as to the tows themselves. Having a flotilla stretching out 800 or 1,000 feet behind her in the navigable channel, common prudence required the Niagara to adopt needful measures to signify that state of things to approaching vessels, because such vessels, hearing fog-signals on board the Niagara, would look for danger at the location of the signals, and deem themselves safe in crossing the river to the eastward or the westward, on a course much nearer to her than 800 or 1,000 feet. If the Niagara was unable to supply the tows with the bells or fog-horns necessary to be used in order to properly warn other vessels of the situation of the flotilla, she could at least have required the Easton to station herself where the fog-signals from that vessel would be serviceable, and to maintain the signals. Stationed where the Easton was, from 600 to 800 feet behind the Niagara, her location would seem to have been a judicious one; but it cannot be affirmed that signals maintained on board her would not have assisted the Raleigh in discovering danger and avoiding it while on her course across the river. Irrespective of this consideration, the statute required the Easton, as a steam-vessel, not under way, and in a fog, to sound a bell at intervals of not more than five minutes. For her default in not obeying the rule, the Niagara is responsible as her principal and master.

The remaining question is whether the libelant was not in fault for the collision, as well as both the steam-boats. The statute prescribes that—

"Canal-boats  *  *  *  anchored or moored in or near the channel or fairway of any bay, harbor, or river, and not in any port, shall sound a fog-horn, or equivalent signal,  *  *  *  at intervals of not more than two minutes."

The terms of this statute are not restricted to canal-boats when they are independent vessels, but are broad enough to apply to canal-boats under all circumstances when anchored in a fog, and to include a canal-boat when she is lying among a flotilla in a fog, under charge of a tow-boat. It may well be that an inside boat in a flotilla should not be considered as within the spirit of the statute, and should therefore be treated as not within its meaning, because no practical benefit would result from her signals. However this may be, there seems to be no reason why the statute should not be read as requiring the outside boats of such a flotilla to observe the signals. Surely a multiplication of danger signals to indicate the presence of a stationery object, or a collection of anchored boats, covering a large expanse of water in a fog, could do no harm. The present case illustrates how it might be useful. If one canal-boat in each of the six tiers here had kept sounding a fog-horn at intervals of two minutes while they were at anchor, who can doubt that the chorus of signals would have told the Raleigh, even before she left the dock, certainly before she took her westerly course across the river, of the presence of an anchored flotilla, and warned her of the necessity of extra caution. The language of the statute is explicit and unequivocal. There is no room for interpretation, and it covers the case of a canal-boat in the situation of the libelant's boat. It may impose a duty towards other vessels upon the towing vessel having control of a flotilla under circumstances like the present to maintain proper signals on her tows. However this may be, the statute is addressed directly to the tows themselves when they fall within the described class, and the duty of obeying it is therefore primarily upon the owner of the tow. Those who navigate canal-boats and the other craft described by the statute are as much bound as are any other class of vessel-owners to provide their vessels with all appliances which by law they are required to use when the contingencies of navigation arise. The libelant cannot escape the imputation of fault by ascribing to the Niagara the duty of providing a fog-horn for his boat. The contract of towage between the two vessels implied that each would perform her part in completing the towage service; that proper skill and diligence would be used on board each; that each would be provided with the necessary appliances by law required; and that neither vessel by her own neglect would increase any risk of the other which might be incidental to the voyage. This is not a case in which it is obvious that the fault committed by either the Raleigh, the Niagara, or the libelant was one so remote as to be inconsequential.

A decree is ordered for the libelant for one-half the recovery allowed by the district court, and in other respects as decreed by the district court. The decree will award to the appellants the costs of this court.