## THE WHITNEY.

## THE SHAMOKIN.

### HARRIS et al. v. THE WHITNEY.

### METROPOLITAN S. S. CO. v. HARRIS et al.

(District Court, S. D. New York. January 2, 1897.)

COLLISION—FOG—ROUNDING POLLOCK RIP LIGHTSHIP—LONG TOW—DANGEROUS NAVIGATION WITHOUT SIGNALS FROM TOW—BOTH IN FAULT.

The barge Shamokin, the second barge in tow behind the tug International, each on a long hawser of 70 or 80 fathoms, when proceeding to the eastward through Vineyard Sound in dense fog, was struck by the steamer H. M. Whitney coming westward at a point about east from the Pollock Rip lightship and sank soon after. The tug and steamer as they approached gave proper whistles for passing, each to the left. The tug was seen as she went past about 200 feet distant; the first barge, 500 feet astern, was passed considerably nearer. No further signal was heard indicating any other barge behind the first, and no hawser was seen: the Whitney, after a few moments' waiting, went on to round the lightship, and in a few moments the Shamokin was seen crossing the Whitney's bow from port to starboard, when it was too late to avoid collision. Such tows have long been common in that region, with even more boats in tow. The course in rounding Pollock Rip lightship changes about 5½ points; and it was necessary for boats meeting in that vicinity, in fog, to keep within the range of the lightship's signals. The steamer's officers supposed that the tug and her tow were proceeding upon a course opposite to their own, and parallel with it. This was not so, because on the exchange of the first signals the steamer and the tug both starboarded; and this mistake largely contributed to the collision. *Held*: (1) That the steamer was in fault for not noticing by her nearer approach to the first barge that she was crossing the line of the tug and tow, and also for not waiting longer, as more than one tow was quite frequent; (2) that the tug was in fault for dangerous navigation around Pollock Rip lightship with such a tow, in so dense a fog without signals from the tow; and that it was her duty either to come to anchor in a safe place before rounding, as she might have done, or else to provide for signals from the tow while rounding Pollock Rip lightship to give notice of the position of the tow in fog.

In Admiralty. Collision.

James Armstrong, Wilhelmus Mynderse, and P. M. Brown, for Harris and others.

Benedict & Benedict, for The Whitney and the Steamship Co.

BROWN, District Judge. The above libel and cross libel arose out of a collision which took place in a dense fog at about 4 p. m.

on June 26, 1894, near the Pollock Rip lightship, whereby the steamship H. M. Whitney, bound from Boston to New York, struck the sea barge Shamokin, and caused her to sink in a few minutes, resulting in a total loss of the barge and her cargo.

The Shamokin was a large barge, 186 feet long by 36 feet beam, with a carrying capacity of 1,450 tons. She was loaded with coal and was employed in transportation between Philadelphia and Boston. At the time of the collision she was in tow of the tug International, and was astern of a smaller barge ahead of her,— the Hercules,—which was attached to the International by a hawser of some 70 or 80 fathoms; and a hawser of similar length attached the Shamokin to the Hercules. The fleet, which was over a quarter of a mile long, was overtaken by fog the evening previous, and was anchored through the night to the northward and westward of Handkerchief lightship. At about 2 p. m. of the 26th, the fleet got under way to go through Vineyard Sound; but it was somewhat obstructed by fog, and when half way between Shovelfull lightship and Pollock Rip lightship, the fog became dense. The course in approaching Pollock Rip lightship is E. by S. ¼ S. The fleet was on the regular course; and when the fog became very dense, it was within range of the fog signal of the lightship. The tug sounded the regulation signals of three blasts at regular intervals, indicating that she had a tow. The tug was proceeding at the rate of about three or four knots over the land, the tide at the time setting westerly and southerly.

At Pollock Rip lightship the course changes 5½ points to the northward, viz. to N. E. ¼ N. The Whitney approaching in the opposite direction and heading to the southwest, heard the tug's fog whistles, and gave the tug a signal of two blasts, which was accepted and answered with two by the tug, and both vessels starboarded. At that time neither was seen by the other. The tug having previously rounded the lightship, was at this time heading N. E. by N., and on the exchange of signals starboarded until she headed N. by E., thereby changing two points to port. The Whitney starboarded one point until she headed S. W. by S. The tug and steamer were visible to each other as they passed, at a distance variously estimated from 100 to 300 feet, probably at least 200 feet. The Hercules, the first barge astern of the tug, was seen when she was passed by the Whitney, at a considerably less distance than the tug. Soon after the Hercules was passed, the Whitney, seeing no other tow, started up her engines and ported in order to round the lightship. Almost immediately after porting the Shamokin was seen not 100 feet distant, crossing the bows of the Whitney from port to starboard. The Whitney reversed, but collision was then inevitable. She struck the Shamokin at an angle variously estimated from 4½ to 7 points, causing damage to both vessels.

The place of collision, and the approximate heading of the Shamokin at the time (about which there has been considerable controversy), it seems to me are pretty definitely fixed by two circumstances: (a) The master of the Whitney testifies that just before the Shamokin was seen the Whitney was heading S. W. by S., and

that the signals from the Pollock Rip lightship bore a point and a half or two points forward of his starboard beam. The Whitney must, therefore, have been at that time about E. by S. from the lightship. There could have been only very little change, not over one point to starboard in the Whitney's heading, between that time and the collision. (b) The angle of collision was about five or six points, and on the Shamokin's starboard side; so that the Shamokin was probably heading about N. by W. I have no doubt, therefore, that the course of E. by N. said to have been given by the Shamokin's helmsman in reply to the captain's inquiry, about which there was considerable controversy, was a mistake for N. by E., according to the Shamokin's compass. Had her course been E. by N., and the angle of collision five points, the Whitney must have been heading about S. S. W. and have struck on the Shamokin's port side; or, if she struck on the Shamokin's starboard side, as I think it certain she did, the Whitney must have been heading N. W. at collision, which is not credible.

I must find, therefore, that the collision was about east by south from the lightship; that the Shamokin was then heading about north by west, having already swung around the lightship, so that she was tailing about two points off to the eastward from the line of the tug's course of N. by E., and by so much the more swung across the course of the Whitney, which she was crossing when first seen, at an angle of about four points.

From the above circumstances, the explanation of the collision is easy:

(1) The Whitney did not know the number of barges constituting the tow astern of the tug; and the Shamokin, the second barge astern of the tug, and about 1,200 feet distant from her, gave no notice of her presence, or of her position, and swung across the Whitney's bows. (2) The Whitney's officers supposed the tug was going upon an opposite parallel course; whereas the Whitney's course converged upon the course of the tug and the Hercules by an angle of two points, and upon that of the Shamokin by about four points. The Whitney's ignorance and mistake in these particulars, however, do not, in my judgment, absolve her from blame for the following reasons. The tug and tow were going at the rate of about four knots through the water. From the nature of the blow, the convergence of the vessels, and other indications in the testimony, I have no doubt that the Whitney was going through the water as fast as the tow at least, and probably faster; how much faster, I cannot determine. Her full speed was about 15 knots. In passing from abreast of the tug to abreast of the Hercules, a distance of from 600 to 700 feet, the boats must have come at least 100 feet nearer to each other. This accords with the testimony of the lookout on the Whitney, who says that the Hercules passed much nearer than the tug, viz. about 60 feet or so distant. This nearer approach towards the Hercules, which was observed by the lookout, ought to have been observed by the officers of the Whitney; and if observed, it would have been sufficient notice to them that the Whitney's course was not parallel with that of the tow, but converging upon the tow's course, and that instant

reversal was necessary in order to stop the Whitney's speed, if there should happen to be any other boat in tow astern of the Hercules. It does not clearly appear whether the Whitney's officers observed this nearer approach of the Hercules or not; but I must hold 'them chargeable with knowledge of what they might and ought to have observed.

It is contended for the Whitney that she waited a reasonable time for any additional tow to come into sight, and that not seeing any other, nor hearing any sign of any other, she was justified in going on, as well as in porting in order to make her turn around the lightship. It is certain, however, that there could not have been any considerable waiting by the Whitney after the Hercules had been passed. For the distance between the Shamokin and the Hercules was not over 500 feet, and the Shamokin could be seen at least 150 feet away; so that there were only 350 feet past the Hercules to be covered before the Shamokin would be seen; and under the combined speed of the tow and the Whitney, this distance would have been certainly covered in from 20 to 25 seconds; so that the Whitney's waiting must have been less than that; and when the Shamokin became visible on the Whitney's port bow, the collision, with the Whitney's speed, could not then be avoided.

The weight of proof is clear, not only that tows similar to this are very common in Vineyard Sound, but that the usual number of boats in tow is at least two, and often more; rarely only one tow. The Whitney ran regularly upon this route, and the usual practice of tows must have been well known to her officers. She had no right, therefore, to count on a single tow only, but was bound to take reasonable precautions against other boats likely to be in the same tow. I must find her to blame, therefore, both for not waiting a reasonable time before starting up her engine and porting, and for not having reversed from the time that the Hercules was seen by the lookout to be much nearer than the tug had been.

2. But I also think that the tug and barge (owned by the same company) should be held in fault, either (1) for voluntarily conducting unnecessary and dangerous navigation in a very dense fog in a difficult place; or else (2) for not giving notice to the Whitney of the Shamokin's dangerous position at the tail of a long tow, swung across the usual channel course 4¾ points, and therefore presumptively across the Whitney's course, when the Whitney's fog signals were heard approaching near. The Shamokin, though having no motive power, had a steam whistle; and she was owned and run by the owners of the tug; so that any negligence by either the tug or the tow, is attributable to them.

Considerable testimony was given for the defense to the effect that navigation in dense fog in Vineyard Sound, and particularly around Pollock Rip lightship, was highly dangerous, and that the tug and tow might easily have anchored in a safe place before reaching the lightship. Though there was some contradiction in the evidence on this latter point, I am persuaded from the affirmative testimony, as well as by consulting the chart, that the tug would have found no difficulty whatever in anchoring in a perfectly safe place had she desired to do so before rounding Pollock Rip lightship.

But the question of reasonable safety in navigating around Pollock Rip lightship and in the channel to the north of it during dense fog, is manifestly dependent on the provision that is made for giving notice of the position of the tow to other vessels that are about to round the lightship from the opposite direction. Both vessels, in rounding, must keep within range of the lightship's signals, or else all knowledge of their position is lost; and it is doubtless impossible that a tow of several boats in thus swinging around nearly a right angle, should be kept in line; particularly the hinder boats; so that if no means are provided of signifying to an approaching vessel the position of the hinder boats, such navigation in dense fog seems to me in the highest degree dangerous, and unjustifiable, as the respondents' witnesses contend.

From time immemorial it has been the usage of seamen in the presence of recognized danger from other vessels, to give signs of warning; such as by shouts, by a gun, by a drum, or by any other means available. The Bay State, 1 Abb. Adm. 239, Fed. Cas. No. 1,148. And where a steam whistle is on board, as on the Shamokin, I can see no reason why that whistle should not be availed of, as the readiest and most effective instrument to give such warning. The twenty-fourth rule expressly provides that "nothing in the rules shall exonerate any ship from the consequences of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case." No rule or regulation prohibits the use of a whistle; while the new rules of 1890 (article 15) provide that a specified signal of three blasts "may be given by the tow." This provision could only have been made because it was known that there were situations in which it was necessary that a tow should give notice of her position in order to prevent disasters; and I cannot conceive of any situations in which such a notice is more imperatively necessary than in situations like the present, if such navigation is to be permitted at all.

Had the Shamokin given notice of her bearing by this perfectly simple and practicable method, showing her position much off on the Whitney's port bow, the Whitney would have had earlier notice of her peculiar and dangerous proximity and would naturally have reversed at once, probably in time to prevent collision. If the Whitney ought to have reversed when the convergence of her course upon that of the tow was discoverable, still there was nothing to lead her to suppose that the Shamokin lay two points still further to the eastward; and if the Shamokin had been in line with the tug and tow ahead of her, probably no collision would have occurred. Evidently no arrangement, and no provision, were made by the International that the Shamokin should use her whistle, or give any warning signals, whatever her position, or whatever the danger to herself and to other vessels might be. Such navigation continued voluntarily, and without necessity, under circumstances like those in the present case, I must find to be highly dangerous, and unjustifiable. Without some such provision for signals from the Shamokin to indicate her position, the tug was, I think, bound to come to anchor. The Sylph, 4 Blatchf. 24, Fed. Cas. No. 13,711; The Raleigh, 41 Fed. 527,

affirmed 44 Fed. 781; The Girolamo, 3 Hagg. Adm. 174; The Lancashire, L. R. 4 Adm. & Eccl. 198.

In the case of The Raleigh, 44 Fed. 781, the tug Niagara had anchored in thick fog in the North river, a little below the Englewood dock, with a flotilla of canal boats stretching behind her about 800 or 1,000 feet. Upon appeal, Judge Wallace, in his opinion, says:

"Having a flotilla stretching out 800 or 1,000 feet behind her in the navigable channel, common prudence required the Niagara to adopt needful measures to signify that state of things to approaching vessels, because such vessels hearing fog signals on board the Niagara would look for danger at the location of the signals and deem themselves safe in crossing the river to the eastward or the westward on a course much nearer to her than 800 or 1,000 feet."

And in that case the Niagara was held in fault, though she had herself given the required signals, because she did not provide that her helper, the Easton, which had a steam whistle, should give additional fog signals to indicate the position of the tow. Such signals were still more imperatively required by "common prudence" in the present case, because the tow here was still farther behind the tug; because the tow in motion was more dangerous than one at anchor; and because navigation by other vessels, which was to be looked for in going around Pollock Rip lightship, was far more dangerous than in the straight channel of the North river. In the same case, it was further held under a somewhat liberal construction of the state statute, and for the purpose of securing safety, that the tow boats themselves were also required to give fog signals; and the libelant's recovery was on the latter ground reduced one-half.

In the present case, though there was no statute requiring the tow to sound her whistle, the reasons upon which the statute is founded, apply in a more urgent degree, for the reasons above stated: and the requirement of "common prudence" that the tug International should have arranged and provided that the Shamokin should sound her whistle in such situations in order to give notice of her position was greater than that the Niagara should provide that the Raleigh should give signals at the end of her tow.

In the case of The City of New York, 49 Fed. 956, the circumstances were different in several respects. There is no intimation in that case that it was intended to overrule the decision in the case of The Raleigh, to the effect that it is the duty of a tug under circumstances of special danger to make provision for giving fog signals by whistles, where such means are available to indicate the position of the tow far astern. I think I should follow that case, believing it to be sound in principle, and correct in application, in both cases alike.

I find, therefore, that it was the duty of the International either to anchor in a safe place, as she might easily have done before rounding Pollock Rip lightship, or else before proceeding on, to arrange for the giving of suitable fog signals by the Shamokin to indicate her position,—some 1,200 feet astern. Having done neither, I must find her in fault for dangerous and unjustifiable navigation; and the damages are, therefore, divided.

A decree may be entered accordingly, with a reference to compute the damages if not agreed upon.