THE ARTURO.

*(Circuit Court, D. Massachusetis.   January 18, 1881.*

1. TUG AND TOW—WHEN TUGS ARE JOINTLY LIABLE—USAGE OF PORT.
    Two tugs, belonging to different owners, engaged to tow a vessel under a general order for towage given by the master through other persons, while in command of the master of the tug first engaged, in accordance with the usage of the port, negligently landed the vessel while in tow upon a well-known shoal. *Held,* that both tugs were liable for the damages sustained by the vessel.—[ED.

In Admiralty.   Damage.

On the morning of the twenty-fourth of February, 1879, the Italian barkentine Arturo was lying at the pier of the Grand Junction wharf, in East Boston, known as No. 5, or the Elevator pier, where she had received her cargo, and was

soon to proceed to England; but, being notified that her berth was wanted, her master desired to be towed to the wharf of the Eastern Railroad Company, which lies up the harbor in a north-westerly direction.

A channel suitable for all classes of vessels has been dredged to the Grand Junction wharves; but to the southward and eastward there is comparatively shoal water.

The Arturo was heading up the dock, and to take her to her destination it was necessary that her head should be turned after she should come out of the dock, or while she was coming out. Two tugs, the J. C. Cottingham and the Nabby C., belonging to different owners, fastened to the barkentine, one on each quarter, and backed her out of the dock. A very fresh wind from the north-west and a strong ebb tide were constantly setting her towards the bank or shoal water above mentioned, and she grounded there almost immediately after leaving the dock, and sustained the damage complained of. The district court pronounced both tugs to be in fault. The J. C. Cottingham did not appeal. The question in this court was whether the Nabby C. was chargeable.

There was evidence tending to show that the consignees of the Arturo had another Italian ship to be moved that morning, and asked Mr. Sargent, a shipwright, to procure her to be towed. Mr. Sargent had some interest in the J. C. Cottingham, or in her employment. He spoke to Mr. Sprague, who was agent for the tug Salem, and it was understood between them that this first vessel, the Danielo, should be moved by those two tugs. On returning to the consignee's office, Mr. Sargent met the master of the Arturo, who asked him to procure towage for that vessel. Mr. Sargent went again to Mr. Sprague, and asked him to have the Arturo towed as soon as the towage of the Danielo was finished. Mr. Sprague procured Captain Chase, master of the J. C. Cottingham, to go to the Danielo, and to notify the Salem to assist him; all which was done, and the Danielo was moved by those two tugs. Captain Chase understood that the Salem was to assist him with the Arturo, but there was another engagement for her, and Captain Scollay, of the Nabby C.,

went, at Mr. Sargent's request, to assist the J. C. Cottingham, which had already gone over to Grand Junction wharf.

When the Nabby C. arrived at the pier 5, she made fast, as directed by Captain Chase, who took command of all three vessels, and gave orders to back the tugs. The captain of the Nabby C. obeyed all the orders of Captain Chase.

There was evidence of a usage in the port of Boston that the tug first spoken to "had the job;" that is, the right to conduct the navigation. And one witness testified that if the owners of the tugs were different, those who received the order, or the first order, sent in the whole bill. He added, that if it came to a lawsuit, he understood that each stood on its own bottom. The master of the Arturo had given a written order, but it was written in Italian, and the witnesses could not give its contents; they understood it to be a general order for towage, not specifying the number of tugs or their names.

*C. T. Russell* and *C. T. Russell, Jr.*, for libellants.

Tugs are bound to care and diligence, and to know the currents and shoals of the harbor in which they ply, and their own ability to do the work. *The Margaret*, 94 U. S. 494; *The Express*, 3 Cliff. 462; *The Trojan*, 8 Ben. 498; *The Niagara*, 6 Ben. 469. The burden of proof is on them to show that there was no negligence. *The Webb*, 14 Wall. 406; *The Belknap*, 2 Low. 281; *The Clover*, 1 Low. 342; *The Workman*, Id. 504. See, on both points, *The Lady Pike*, 21 Wall. 1; *The New Philadelphia*, 1 Black, 62; *The Zouave*, 1 Brown, Adm. 110; *Trans. Line* v. *Hope*, 95 U. S. 297; *Smith* v. *St. Lawrence Co.* L. R. 5 P. C. 313; *The Armstrong*, 1 Brown, Adm. 130; *The Austen*, 3 Ben. 11; *The Morton*, 1 Brown Adm. 137; *The Mohler*, 21 Wall. 230; *The James A. Wright*, 3 Ben. 248; *The U. S. Grant*, 7 Ben. 337; *Hays* v. *Paul*, 51 Pa. St. 134.

The Nabby C. was employed by the bark, and was not the mere servant of the J. C. Cottingham. Recovery can be had in admiralty against an offending thing, without regard to ownership or agency. *The Ticonderoga*, Swabey, 215; *The Ruby Queen*, Lush. 266; *The May Queen*, 1 Sprague, 588;

*The R. B Forbes,* Id. 328; *The Rescue,* 2 Sprague, 16; *The Carolus,* 2 Curtis, C. C. 69.

The duty of the tug not to injure the tow does not arise out of the towage contract, but is imposed by law. *Phila. & Reading R. Co.* v. *Derby,* 14 How. 468; *The Clarita & Clara,* 23 Wall. 1; *The Quickstep,* 9 Wall. 665; *The Deer,* 4 Ben. 352.

*J. C. Dodge* and *W. W. Dodge,* for the claimants, appellants.

The modern rule of the admiralty, in cases of damage by a vessel in tow, is that the vessel whose master is actually guilty of negligence shall respond. *The John Frazier,* 21 How. 184; *Sturges* v. *Boyer,* 24 How. 122; *The Maria Martin,* 12 Wall. 31; *The Mabey & Cooper,* 14 Wall. 204; *Sproul* v. *Hemingway,* 14 Pick. 1. They also referred to some of the cases cited by the libellants.

By the usage of the port the Nabby C. was under the absolute control of the master of the J. C. Cottingham, and his tug alone is responsible for his negligence.

Vessels coming to a port are bound by and presumed to know its usages. The libellants, therefore, knew that their implied contract, if they had one, with the Nabby C., was merely that she should assist and act under the orders of the other tug. *Goodenow* v. *Tyler,* 7 Mass. 36, 46; *Dwight* v. *Whitney,* 15 Pick. 179, 183; *Benson* v. *Schneider,* 7 Taunt. 272; *Cuthbert* v. *Cumming,* 10 Exch. 809; affirmed, 11 Exch. 405.

LOWELL, C. J. The careful collection of authorities by counsel will save me the necessity of citing them. They do not decide the precise question of this case. Two tugs, belonging to different owners, are sent to tow a vessel under a general order for towage given by her master through other persons. If the owners of the tug first spoken to undertook to do the work, or cause it to be done, they may be regarded as the sole contractors, bound by their undertaking to see that it is properly done, and they would be personally liable for any negligence, defect in machinery, disobedience of orders, or whatever else, on the part of either vessel, may have caused

the damage. Under the statute for limited liability, (Rev. St. § 4283,) it might be impossible to recover the whole loss; but to the extent of the value of the tugs there would be a remedy *in rem*. The ownership of the tugs would not be material, except as regards the limitation of personal liability. If the tugs were owned, borrowed, or hired by the contractor, their liability *in rem* would be the same. If, then, it were proved that the J. C. Cottingham hired the Nabby C., as alleged in the answer of the appellants, it would not, in my opinion, exempt their tug.

Upon the evidence as I understand it, however, the J. C. Cottingham did not undertake to do the work and furnish all necessary assistance; Mr. Sprague, who acted for the ship, engaged both tugs. The transaction appears to me, as to the district judge, to be, in effect, several contracts for a joint operation. If, therefore, one tug was wholly in fault, as by a defect of her machinery or the like, she alone would be responsible. But for their joint action, so far as it conduced to the loss, I hold them to be jointly responsible. And that is this case.

If the usage of the port undertook to throw upon one tug the responsibilities of two or more, it would be void; but I do not understand that any such usage was proved. The usage is that the captain of the first tug has charge of the enterprise. Some one must have the sole authority, and it is as convenient and proper a rule as any other, that it should be that one who is first engaged. But this is only a rule of convenience, and what it does in respect to the tow is to make the master of No. 1 master, likewise, of No. 2. If Captain Scollay had any doubt of the competency of Captain Chase, the usage would not require him to serve. He might decline to work on those terms; but when he accepts the usage, in the particular case, he accepts a master for his vessel.

These cases of tow against tug are, in form and fact, very like collision cases. The contract gives rise to duties very closely resembling those which one vessel owes to others which it may meet. There is, therefore, an analogy between

the two classes of cases so close that the tow may sue in one proceeding for damage her own tug and a strange vessel with which there has been a collision.

If a ship in command of a pilot whom it was compelled to take, injures another ship through fault of the pilot, the ship is liable unless exonerated by statute. If charterers are owners for the voyage, and appoint the master and crew, the ship is still liable. If she were navigated by pirates, who had run away with her, she would, in my opinion, be responsible to the injured ship. If she is in tow, her liability does undoubtedly depend upon whether her master or the master of the tug commands the two vessels, if the negligence is that of the commander. This is a relaxation of the old doctrine of the liability of the vessel. But, even then, the ownership of the tug or tow is immaterial. I cannot doubt that the rule is the same as to two tugs, or any number. If the tow does not command, the tugs do, and they arrange between themselves how the navigation shall be conducted. The rights of third persons do not depend upon their ownership or command. I have taken for granted that there might be a still further relaxation as to any fault distinctly committed by one of them only.

If the case depends upon contract, I think the owners of each tug pledged her that no fault should be committed by her; if, upon general doctrines of admiralty law, which are, to some extent, independent of contract, the vessel actually in fault, through negligence in her mode of navigation, though the negligence is that of a temporary master adopted by usage, is liable.

There is no question that the navigation was so negligently conducted that, in broad daylight, with obvious conditions of wind and tide, the ship was landed upon a well-known shoal. There is none that Captain Chase should have taken a line to the wharf, or have provided, in some other of the modes suggested by the experts, for counteracting the effect of the wind and tide; nor that Captain Scollay's tug, without any fault of his, or his crew, aided to run the ship aground.

In this state of facts, both tugs are liable for the damage.