THE EXPRESS.[1]

THE NIAGARA.

THE N. B. STARBUCK.

THE CHARM.

NEW YORK & CUBA MAIL S. S. CO. *v.* THE EXPRESS, THE N. B.
STARBUCK, and THE CHARM.

NEW ENGLAND TERMINAL CO. *v.* THE NIAGARA, THE N. B. STARBUCK,
and THE CHARM.

*(District Court, S. D. New York. November 28, 1890.)*

COLLISION—STEAM VESSELS CROSSING—EAST RIVER NAVIGATION—WRONG SIDE—NOT
SIGNALING—SWINGING COURSE.

The steam-boat E. was on a trial trip up the East river, running at the rate of less
than eight knots, and in the middle of the river. While rounding Corlear's Hook,
and before she had headed straight up river for the reach above, the steam-boat
N., in tow of two tugs, was seen some way ahead in about mid-river, heading
somewhat towards Brooklyn. The E. gave two whistles to indicate that she would
pass the N. on the New York side, and, getting no answer, stopped and repeated
her signal, when, seeing the leading tug give a sheer towards New York, the E.
reversed, but nevertheless struck the N. on her starboard bow. The collision was
on the Brooklyn side of mid-river. From the time she sighted the N. the E. had
been continually swinging to port. The N., without steam, was in tow of the tugs
S. and C., the S. ahead on a hawser, and the C. along-side the N. They had come
from Ninth street, New York, bound down the East river, and might have kept on
the New York side of the stream. The first signal of the E. was not understood by
the S., though heard by many on shore. There was no satisfactory evidence of any
timely signals from the tugs, and they gave no signal of three whistles under in-
spector's rule 3, in order to come to a common understanding. *Held,* that the tugs
were in fault for the collision, (1) for unnecessarily going to the easterly side of
the channel with the N. still headed towards the Brooklyn shore; (2) for not prop-
erly signaling, or answering the signals of the E.; (3) and for attempting to haul
the N., after she was nearly across the line of the E., towards the New York shore
at the time of her last signal, through probable inattention to the previous signals,
and to the position and heading of the E. at the time. As to the fault of the N.,
question reserved.

In Admiralty. Cross-suit for damages by collision between the steam-
boats Express and Niagara.

*Carter & Ledyard,* for the Niagara.

*Wing, Shoudy & Putnam,* for the Express.

*Robert D. Benedict,* for the Starbuck and the Charm.

BROWN, J. The above cross-libels were filed by the owners of the
steamers Niagara and Express, each about 298 feet long, to recover the
damages sustained by them, respectively, through a collision in the East
river, a little before noon on December 2, 1889, just above Corlear's
Hook. The steam-tugs Starbuck and Charm were made parties defend-
ant in the original cause under the twenty-ninth rule, upon the petition
of the owners of the Express. Upon the filing of the petition, the own-

---

[1] Reported by Edward G. Benedict, of the New York bar.

ers of the tugs appeared without process, as claimants, and filed a stipulation for value.

The Niagara was coming down the river in tow of the two tugs, without any steam-power of her own, bound for the North river. The tide was near the last of the ebb in mid-river, running down not over a knot an hour, while the current was already setting upwards on both shores. The tug Starbuck was leading, with a hawser of from 120 to 150 feet attached to the Niagara's starboard bow. The Charm was along-side the Niagara, a little aft of amid-ships on her starboard side. The Niagara had been taken from the Ninth-Street dock, New York. She came down river within 100 feet of the ends of the piers to Third or Fourth street, when the tugs pulled sharply out into the river, so that when abreast of the Houston-Street ferry the Niagara headed for Havemeyer's on the Brooklyn side, at South Third or Fourth street, a change of at least three points. She proceeded to port towards mid-river, and swung gradually to the southward, so as to head for the upper part of the navy-yard, or Cobb dock. The pilot of the Charm was on board the Niagara, directing her navigation, in conjunction with the Niagara's captain, who was also present at the wheel, and gave some orders. When nearly abreast of the Broadway ferry, Brooklyn, and on a line running from the upper slip of the Grand-Street ferry, New York, she was struck on the starboard bow by the starboard corner of the Express, a new square-headed steam car-float, which had just rounded Corlear's Hook, coming from Rutgers street upon a trial trip up the East river. On leaving Rutgers street, the Express went out into about mid-river, and then up on the usual course. While rounding the hook, and before she had got headed straight up river for the reach above, the Niagara and her tugs were seen in about mid-river, and apparently off about Stanton or Rivington street, all heading towards the Brooklyn shore, and all showing their starboard sides. The master of the Express, deeming it imprudent to attempt to pass on the Brooklyn side, soon after gave a signal of two whistles, and, getting no answer, stopped her engines, and gave a second signal of two whistles, to which no answer was received. At about the same time the Starbuck took a sheer towards the New York shore, whereupon the Express reversed strong until the collision. At the time the last signal was given the Express was pointing nearly up-river, and for the stern of the Niagara, which was probably about 300 yards distant. The course of the Niagara was changed about a point by the sheer of the Starbuck, and by her own hard a-port helm. In behalf of the Express it is contended that the collision was caused by the Starbuck's sheer, and the Niagara's change of course, and through her improper presence on the Brooklyn side of the river, and inattention to the signals of the Express. On the part of the Starbuck there is some evidence that a signal of one whistle was given in answer to some signal from the Express, that was indistinctly heard by the Starbuck and not understood, and that there was one blast from the Charm when the vessels had approached very near each other. Neither of these signals were heard on the Express.

From the time the Niagara was first seen, probably about half a mile away, the Express was always on the swing to port until her engines were reversed. It is undoubtedly this circumstance that has led to more than usual diversity in the testimony in reference to the bearings of the Starbuck and Niagara at different times during this swing. There is no doubt, I think, that when the Niagara was first seen, the Express was about in mid-river between the marble yard and Ordnance dock, near the point indicated by Capt. Bixby on the chart, heading at that time about for the Broadway slip, (which is up-river at that point,) and that the Niagara was then about abreast of Rivington street, or South Fourth street, Williamsburg, heading for the northerly part of Cobb dock, and being then in mid-river, or, as the three Williamsburg pilots say, a little on the Brooklyn side. Upon those courses the Niagara would be heading about one point towards the Brooklyn shore, and the course of the Express would be crossing that of the Niagara by an angle of nearly four points. The weight of evidence is that the leading tug, the Starbuck, was heading at the time of the first signal from the Express about down river, which would make her course about a point more to starboard than that of the Niagara. It is claimed on behalf of the latter that this ought to have been perceived by the Express, and was sufficient evidence that the tugs were endeavoring to haul the Niagara towards the New York side of the river, and that the Express was consequently not justified in proposing to go to the left with a signal of two whistles. I am not convinced of the soundness of this contention. The clear weight of testimony, particularly that derived from disinterested witnesses, who had the best means of estimating, is that the collision took place decidedly on the Brooklyn side of the river, nearly, if not quite, two-thirds of the distance across towards the Brooklyn shore. Some two and a half or three minutes probably before the collision the Niagara was seen moving from across mid-river in that direction, nearly half a mile distant, at an angle of three or four points with the heading of the Express. I see no reason to doubt the truth of the testimony of the latter's witnesses that the Starbuck seemed to be moving in the same direction as the Niagara, and right ahead of her. It was impossible, I think, looking sideways at such an angle, to distinguish a difference of a point in the headings half a mile away or half that distance. The Niagara being much the larger vessel, her heading would be more easily and certainly perceived. The Express was bound to take notice, from the Niagara's evident heading and position, either in mid-river or already on the Brooklyn side, that the Niagara might be intending to go to the Brooklyn shore; and as her speed was not known, and the river above was much narrower, and so large a vessel upon a hawser was more or less unwieldy, the Express was bound to act with special caution, and not attempt to cross the line of the Niagara's course in order to pass her on the Brooklyn side, towards which she was drawing, until some change in her course was evident. Her master and pilot were called upon to determine what was most prudent under circumstances of uncertainty as to the Niagara's intentions; and in the absence of any signals from the

Starbuck or Niagara, signifying what their intentions were, I think the Express was justified in her signal of two whistles proposing to give the Niagara the easterly shore, towards which she was moving. The Express had a right to expect an answer, but got none. She then stopped her engines, and soon after repeated her former signal, and still heard no answer, though watching for one. In the mean time her stem had been swinging to the northward, bringing her in the rapid narrowing of the river on the easterly shore, somewhat on the easterly side, so that at the time of the last signal, when the vessels were probably about 350 yards apart, she was pointing about for the stern of the Niagara, and perhaps a point towards the easterly shore above Greenpoint. In this situation there was no reason why the vessels should not have passed clear, as they plainly would have done had the Niagara kept her course, and had not the Starbuck hauled off strongly to the westward, and the Niagara put her wheel hard a-port, so as to bring her across the heading of the Express. The moment this was perceived, the Express backed strong until her head-way by land was nearly or quite stopped, her head meantime swinging unavoidably somewhat to starboard, while the Niagara also hauled about a point to the westward.

I do not perceive any fault in the Express in these maneuvers. The collision, as it seems to me, was brought about by three faults on the part of the tugs and the Niagara: (1) Unnecessarily going to the easterly side of the channel, and with her course still kept directed towards the Brooklyn shore; (2) in not signaling herself, nor properly answering the signals of the Express, as required by the regulations; and finally (3) in attempting to haul the Niagara towards the New York shore and across the course of the Express, at the time of her last signal, evidently through inattention to the signals, the position, and the heading of the Express. From the testimony of several disinterested witnesses, as well as of many others on board the Express, there is no doubt that the signal whistles of the Express were clearly sounded, and ought to have been heard and heeded by the Starbuck and Niagara. There are few circumstances in which the need of proper signal whistles, such as the regulations expressly require, is more urgent than in a case like this, where vessels are rounding a sharp bend in the river, and one of them is a large ship upon a hawser without motive power of her own. The testimony of the pilot of the Starbuck in reference to his hearing and giving whistles seems to me quite unsatisfactory. It is plain that there was no endeavor on his part to come to any common understanding by signals, as it was his duty to do. He says he did answer a signal from the Express, but without exactly knowing what that signal was. He got no reply, and did not repeat his own signal. This is not a compliance with the regulations. He seems to have taken it for granted that the Express would keep out of his way; and, I think, he gave her very little attention till the last signal. There was also no lookout proper on either the Niagara or the tugs. I am not satisfied that any signal whistle was given by the Starbuck until she was so near that it was of no use. Her mate remembered none; and none was given by the Charm until the vessels were

very near together.. It cannot be claimed that the absence of signals was immaterial. A common understanding by means of them was of the utmost consequence. Next to the requirement that each vessel should keep as near the middle of the river as may be, and pass to the right, signals are among the most important of the means provided by law for the avoidance of collisions. *The Connecticut*, 103 U. S. 710, 713. I cannot for a moment doubt that had proper signals been given by the Starbuck, at a reasonable distance, indicating that she intended to go towards the New York shore, the Express would have gone, as she might then have safely gone, towards the Brooklyn side. It was the conduct of the Niagara, in continuing to cross mid-river, and to approach towards the Brooklyn shore when first seen, and her continuance of that heading without any proper and timely whistles indicating an intention to go back to the New York side, that compelled the Express to hold herself in a position of expectancy to do what might be apparently needed, maintaining about her relative place in the river, as she did, until her last signal, when she was compelled to back by the darting of the Starbuck towards the New York shore, which made it impossible for her to go ahead safely on either side. This sudden hauling of the Starbuck towards the New York shore must also be ascribed to inattention by the Starbuck to the headings of the principal vessels,—the Express and the Niagara. There was no proper lookout on either the Niagara or the tugs. . *The Ariadne*, 13 Wall. 475, 478. I have no doubt, both from the direct testimony, as well as from the swing of both vessels to starboard, and the cutting of the hawser, that at the time when the Starbuck sheered, probably about a minute or a minute and a half before the collision, the Niagara's bows were already across the line of the course of the Express, and still heading at least a point to the eastward or starboard of the course of the Express, and that, had the Starbuck observed this, and gone to the eastward, as she ought to have done in that situation, there would have been no collision. The small angle of collision, about a point or two only, notwithstanding some starboard swing of the Express in backing, leaves no doubt that had the Starbuck taken that course the Express would easily have passed clear to the westward. Whether the Starbuck was or was not a point to starboard of the Niagara at that time is immaterial. She could easily have gone towards the Brooklyn side. It was then too late for the Express to go to the eastward, and the Starbuck's sheer prevented her going to the westward, and made collision unavoidable. The Express properly reversed to avoid collision if possible; or, if not, to reduce its effects to a minimum.

There was no cause and no necessity for the Niagara to be upon the easterly side of the river. The statutory duty to go in mid-river and pass to the right required her, when nothing was in the way, to keep on the westward side. Her own evidence leaves no doubt that she could have kept there at all times had any serious effort been made to do so. The chart put in evidence shows no reason why, after leaving Ninth street, she should not have hauled out towards the middle of the river anywhere below Eighth street, with a tow drawing but 15 feet. This would have

given her a very easy curve. But, aside from this, her testimony shows that after keeping close to the New York shore until she reached Third or Fourth street, she then hauled to port so as to head for Havemeyer's when abreast of Houston street, thus changing at least three points in going down river about 500 feet, notwithstanding this change was obstructed by the flood-tide on shore. A similar change of three points to starboard, effected from the time when she was off Houston-Street ferry, and outside of the Stanton-Street reef, which extends out only about 300 or 400 feet, would have brought her heading straight down the river, instead of towards the Brooklyn shore, and have kept her all the time within the New York side of the river, and would have been accomplished at least a fifth of a mile above the place of collision, and probably before she was seen by the Express. The sheer of the Starbuck and the Niagara cannot be justified as an error *in extremis*, because the situation, when this error was committed, was a faulty one, for which they were themselves to blame. *The Elizabeth Jones*, 112 U. S. 514, 5 Sup. Ct. Rep. 468.

I do not think the speed of the Express was at any time substantially above the statute limit of eight miles an hour, allowing about a knot for the ebb current. If at one time previous it may possibly have been a little above eight miles, which I doubt, it was reduced by stopping her engines at such a considerable distance from the Niagara as not to constitute a proximate cause of the collision. At the time when her last signal was given, she was running, I think, at the rate of less than seven knots, and from that speed she would stop more quickly than the ordinary finer line steamers of the same maximum speed; that is, probably in less than one and a half minutes, and in less than 550 feet. *The Normandie*, 43 Fed. Rep. 151, 160. The Niagara, coming down with a current of about a knot, was probably going at the rate of two and a half or three miles an hour. Though this speed was somewhat checked, there remained sufficient speed to account for the damage done in the case of vessels so large as these. The above rules, as to the navigation of the East river, have been constantly applied in this court, and have been affirmed in the circuit court. See *The Rockaway*, 38 Fed. Rep. 856, affirmed, 43 Fed. Rep. 544; *The Chas. R. Stone*, 18 Fed. Rep. 190; *The Garden City*, 38 Fed. Rep. 862; *The Anglia*, 41 Fed. Rep. 607; *The Britannia*, 42 Fed. Rep. 67. They seem to me to require the Express to be absolved from blame, and the tugs to be held in fault, irrespective of the rule of the starboard hand, which is not necessarily applicable in turning the bends of rivers. *The Velocity*, L. R. 3 P. C. 44; *The John S. Darcy*, 29 Fed. Rep. 644, 647; *The Oceanus*, 5 Ben. 545.

A decree in the second libel may be entered in favor of the owners of the Express for their damages and costs against the two tugs, whose stipulations are sufficient to answer her demands. *The Bordentown*, 40 Fed. Rep. 682. In the first libel, the Express is entitled to a dismissal with costs. In the first suit no relief was demanded by the owners of the Niagara against the tugs. If relief is sought in her favor against them, I will hear further argument on the part of the tugs upon the question

whether upon the evidence the Niagara was such a participant in the navigation as to be chargeable with half the damages. See *The Doris Eckhoff*, 32 Fed. Rep. 555; *The Carrier Dove*, Brown. & L. 113; *The Niobe*, 13 Prob. Div. 55.