THE W. G. MASON.

THE W. I. BABCOCK.

(District Court, W. D. New York. May 28, 1904.)

1. TOWAGE—DUTY OF TUGS—STRANDING OF TOW.
    Where a large steamer, whose master was unacquainted with the harbor at that point, having loaded at a dock in Buffalo, employed two tugs to take her out beyond the inner breakwater through a narrow and crooked channel, the duty rested on the master of the leading or pilot tug to direct the movements of the steamer required for her safe passage, and his failure to seasonably signal her to start her engines forward after swinging her bow around a bend in the channel, by reason of which the current carried her against the side of the channel, where she stranded, was a fault which renders the tug liable for the resulting damages, where the signals given were promptly obeyed by the steamer, which was not required, under the circumstances, to take the initiative, and would not have been justified in so doing.

2. SAME—BURDEN OF PROOF.
    Where two tugs undertook to take a steamer out from her dock through a well-known and commonly used channel, and she stranded against one side of the channel, although it was shown that she promptly obeyed all signals from the leading tug, the presumption is that such stranding was due to a fault of one or both of the tugs.

3. SAME—JOINT SERVICE BY TWO TUGS—LIABILITY OF ONE FOR FAULT OF OTHER.
    Two tugs belonging to the same owner engaged to tow a steamer, and which co-operated in the service and in directing the movements of the steamer, are both liable for her stranding through the negligence of either.

In Admiralty. Suit against tugs to recover damages for stranding of tow.

Goulder, Holding & Masten (G. B. Marty, of counsel), for libelant.
Hoyt, Dustin & Kelley (H. A. Kelley, G. W. Cottrell, and Harvey L. Brown, of counsel), for respondents.

HAZEL, District Judge. This is a proceeding in rem instituted by the libelant, owner of the steamer W. H. Gratwick, against the steam tugs Mason and Babcock, to recover damages for injuries sustained by the steamer on account of her stranding while in tow of the respondent tugs, and owing to their negligence. The stranding occurred in Buffalo Harbor, October 18, 1901, at 6:15 o'clock p. m., and at a point approximately 150 feet north of the northeast end of the inner breakwater on the northerly channel bank of the Erie Basin. The state breakwater extends north and south. The distance from the Philadelphia & Reading Wharf, the starting point of the tow, to the breakwater, directly across the harbor, is about 600 feet. The Gratwick is 345 feet in length over all, and 45 feet beam. She was laden with 3,874 tons of coal, and drew 16 feet 8 inches forward and 16 feet 9 inches aft. A vessel of the dimensions of the Gratwick, heavily laden, leaving the above-mentioned wharf for the lake, requires care and caution on the part of her

¶ 3. See Towage, vol. 45, Cent. Dig. § 12.

towing tugs. Two steam tugs ordinarily perform the towing service. The course is through a narrow and tortuous, though much frequented, channel about 150 feet wide, which extends a short distance north from a point in the harbor near the wharf. There is shallow water on each side of the channel and near the end of the breakwater. The vessel's approach to the channel where the casualty occurred was sharply to starboard, and then, after being straightened, her course was almost at right angles to port. It was dark, though objects were discernible. Lights were plainly seen on the breakwater, and a range light on the shore. A moderate southwest wind was blowing, and weather clear. The steam tugs and the tow were each in charge of their own officers and crew. It is not questioned that each was properly manned and equipped. At the north end of the state breakwater, or near the place where the Gratwick stranded, a strong current flows in a northerly direction toward Niagara river. The current varies according to the state of the weather. The Gratwick was soon floated, but, after proceeding about 40 feet, she again grounded, and was not taken off until about 9 o'clock that evening. This, briefly, describes the situation where the injuries to the Gratwick, as charged in the libel, were received. The libel charges generally negligence and want of skill, together with ignorance of the channel and currents on the part of those in charge of the libeled tugs. The answer of the respondents describes the ordinary course which vessels take on leaving this wharf, and admits the strength and character of the current at the point where the accident occurred. It is alleged that when the tow of the Gratwick reached the current it became necessary that she should move ahead under a starboard helm; that the pilot tug should pull to port while the stern tug should guide or push the steamer's stern to starboard. It is then specifically charged as a fault that when the bow of the Gratwick, on the night in question, reached the current, which for a short distance was necessarily in her course, and the pilot tug signaled the steamer to come ahead with her own propeller, she failed to obey the directions given with promptitude, and therefore her stranding was inevitable. Neither the wind and weather nor the darkness rendered the towage service especially hazardous. The libelant contends that the principal fault attributable to the tugs was that the towing was carelessly and unskillfully performed, and, further, that the directions from the pilot tug to the propeller were inopportunely and unseasonably given. The established facts are these: The steamer, which was moored to the wharf, intended to proceed to the government breakwater for fuel, preparatory to leaving the port of Buffalo for the port of Milwaukee. Her master engaged the steam tugs Mason and Babcock to tow her. The first-named tug, more powerful than the latter, was the pilot tug. The Mason guided the steamer astern. When the steamer reached a point approximately 200 feet from the point of starting, it became necessary for her to make a turn into the channel toward the lake. Thereupon the Mason signaled the steamer to back so as to stop her headway. This direction was promptly executed, and in obedience to a second signal the Gratwick was quickly brought to a complete stop. Her bow was slowly pulled around to starboard, and she was straightened in the channel in a northwesterly direction, approximately 60

feet distant from the state breakwater on her port side. The vessel was then towed a short distance in the channel in the ordinary way toward the lake northeast of the state breakwater, when she received a signal to reverse her engine. The signal was obeyed. Instantly the Gratwick received another signal of one blast, and promptly stopped backing. In order to efficiently make the turn into the lake, the pilot tug pulled off sharply to port, the tug Babcock meanwhile lapping her port quarter, and pushing her stern to starboard. While the turn was being made, the Gratwick was directed by the pilot to come ahead strong. The master of the steamer, who stood upon the pilot house, near the bell pull connected with the engine room, promptly repeated the signals. The engineer, who was at his post, heard and obeyed them. Barker, engineer of the Gratwick, testified that the engine was in good working condition, and that he obeyed all signals with promptitude. It did not, he says, take to exceed 10 seconds to execute each direction; that when the steamer first brought up on the bank her propeller had been working ahead full speed for about a minute. She continued to work under a go-ahead signal for about five minutes before he received a direction to stop. This evidence of the engineer, expressly corroborated by others of the crew, satisfies me that in every instance, as heretofore observed, the signals of the pilot tug were obeyed with promptitude and alacrity. The Gratwick, however, directly after the signals last referred to, went aground on the starboard bank. The evidence as to whether such signals were answered promptly is in hopeless conflict. The witnesses for the respondents are positive in their declarations that the propeller did not respond until it was too late to avoid the disaster. Upon this controverted point the master of the Mason testifies that as soon as the steamer's bow was straightened in the channel, he signaled her to come ahead, and then, to accelerate her speed, he quickly sounded a "hurry-up" whistle of four rapid blasts. He asserts that as the pilot tug went to port he observed that the steamer did not increase her speed. In view of the darkness and the distance between the tug and the stern of the steamer, this observation can have little evidential weight. It is contended by the libelees that it was absolutely necessary that the steamer should have headway under her own power at this point to prevent drifting onto the starboard bank. Fontaine, master of the Babcock, testified that no answer was made by the steamer to the first signal to come ahead, nor to the hurry-up signal, which instantly followed. He is positive that her propeller wheel did not revolve; that he looked to see; that he intently fixed his eyes on the steamer's crew to see whether the signals were promptly heeded, and that he called the attention of his fireman to the steamer's delay and failure to obey them. I am not convinced of the correctness of this showing. To give it credence would be to assume that the witness anticipated the subsequent mishap. Accidents of this nature, fortunately, have not yet become so frequent in this port that masters and crews of tugs when they start with a tow have forebodings of their occurrence. Other testimony is found in the record tending to show that, if the steamer had used her propeller after she was straightened in the channel, or as her bow entered the current, her safety would not have been imperiled. After carefully considering the evidence, how-

ever, I have reached the conclusion that the evidence of the respondents in explanation of the stranding of the Gratwick is not entitled to probative weight, in view of the more reliable testimony of the master and crew of the Gratwick and the witness Boyer, a passenger. The Alexander Folsom, 52 Fed. 411, 3 C. C. A. 165; The Fannie, 11 Wall. 243, 20 L. Ed. 114. In my judgment, a preponderance of the evidence establishes fault imputable to the ahead tug on account of her failure to seasonably direct the movements of the steamer. Miscalculation as to the exact time for signaling, resulting in failure to safely make the turn into the lake, is a fault. The Brazos, Fed. Cas. No. 1,821. Had the signals been blown earlier, I am convinced that the grounding would not have happened. The master of the Gratwick, as heretofore stated, was observant, watchful, and attentive to his duties. He was not familiar with the channel and the force of the current near the turn into the lake. Therefore he was justified, I think, in relying upon the nautical skill and perspicacity of the pilot tug. Her master, prior to this, had frequently and successfully managed and directed the navigation of tows of similar tonnage and draft from the wharf and channel in question into the lake. He was not confronted by unusual conditions or obstructions. The force of the current and difficulties to be met were well known to him. Moreover, in blowing signals he was obliged to take into consideration the length and character of his tow, whether heavily laden, the effect of the current upon her, and also the interval of time which passes before her motive power would become effective. In explanation of the stranding Fontaine further testifies that the force of the current carried the steamer over on the starboard bank, and that the tugs were unable to guide her. This was probable. I incline, however, to the belief, in view of the manner in which the steamer was lapped by the tug astern on her port side, that she went aground, as heretofore stated, on account of the belated or tardy signals of the pilot tug.

Stress is laid upon the point that the Gratwick must be condemned on account of her failure to use her steering power at a crucial time irrespective of any signaling. I am not satisfied by the evidence that the custom and practice of the port required the Gratwick to make headway without having been directed to do so by the pilot tug. As already appears, the master of the Gratwick was a stranger to the situation. To have used the steamer's propeller of his own volition at that point might have proved destructive to her safety. The proposition is sound, I think, that the head tug dominated and controlled the movements and navigation of the tow. The undertaking to tow was not only to safely transport the steamer to the government breakwater, her destination, or to a point where she would be enabled to use her own steering power, but it was also to direct her course and movements during the operation. It was for the master of the pilot tug to say whether the steamer should hasten or slacken her speed by means of her own motive power, and at what intervals, and for what periods. In short, as indicated, he must manage and direct her course of navigation. Transportation Line v. Hope, 95 U. S. 297, 24 L. Ed. 477. To absolve the pilot tug in the absence of a prior arrangement establishing her liability, she must have exercised ordinary care and nautical skill,

as already suggested. Such care is demanded as a reasonably prudent man would exercise having regard to the particular circumstances under which the steamer was towed at the time the loss was sustained. The care and diligence used must be proportional to the magnitude of the peril. The control by the master of the head tug of the tow presupposes a familiarity with the locality, the channel, its obstructions, which might have been avoided by ordinary care and general knowledge of the situation and its difficulties. Such acquaintance presumptively enables him, as a prudent navigator, to pilot and safely transport the tow to her destination. The reciprocal duty of the steamer was to conform to and promptly obey the signals and directions of the tug. Such is the contract of employment. The grounding of the Gratwick was not caused by the perils of the sea. Any suggestion of inevitable accident of navigation is also without support. The liability asserted against the libeled tugs is based on a maritime tort, and is quite independent of the towage contract. The John G. Stevens, 170 U. S. 113, 18 Sup. Ct. 544, 42 L. Ed. 969; The Temple Emery (D. C.) 122 Fed. 180.

Under the facts of the case, the burden is upon the libelees to satisfactorily excuse their wrongful omission to exercise the degree of care demanded by the situation. A specific act of negligence need not be shown by libelant. The rule which requires affirmative proof of negligence against a tug by her tow is conspicuously distinct from the rule which is applied to a common carrier, who, when proceeded against on contract, is presumptively in fault. Not so, however, where the result indicates negligence upon the part of the tug having charge and control of her tow. It is perfectly true that the adjudications uniformly hold that an engagement to tow imposes neither the obligation to insure nor the liability of a common carrier, and accordingly negligence must be proven by the libelant. The Margaret, 94 U. S. 494, 24 L. Ed. 146; The Lady Wimett (D. C.) 92 Fed. 400; The A. R. Robinson (D. C.) 57 Fed. 667; In re Thomas Wilson (D. C.) 124 Fed. 653; The J. P. Donaldson, 167 U. S. 603, 17 Sup. Ct. 951, 42 L. Ed. 292. The burden is always upon him who alleges the breach of a towing contract to show either that there has been no attempt at performance, or that there has been negligence or unskillfulness, to his injury, in the performance. But the above cases do not strictly apply here. There are exceptions to this rule.

In The Steamer Webb, 14 Wall. 406, 20 L. Ed. 774, the exception is stated in the following language, quoted from the opinion:

"Unlike the case of common carriers, damage sustained by the tow does not ordinarily raise a presumption that the tug has been in fault. The contract requires no more than that he who undertakes to tow shall carry out his undertaking with that degree of caution and skill which prudent navigators usually employ in similar services. But there may be cases in which the result is a safe criterion by which to judge of the character of the act which has caused it."

In the Ellen McGovern (D. C.) 27 Fed. 868, the rule is succinctly stated in the headnote in these words:

"Where one of a large number of boats in a tow is injured by striking some obstruction on a trip over a common and safe route, the burden is upon

the tug to give some rational explanation of the injury, or a consistent account of the trip, that may satisfy the court that there was no lack of due care in navigation."

In the cases from which these quotations are taken the facts are not identical with this case. Nevertheless, the principle as stated has undoubted application. See, also, The Henry Chapel (D. C.) 10 Fed. 777; Transportation Co. v. Downer, 11 Wall. 129, 20 L. Ed. 160. The tug Mason has not satisfactorily excused or explained the disaster. The first stranding was not purely accidental. It would not have occurred unless the tugs, or at least one of them, were negligent. The evidence as to the later grounding is thought to be immaterial, and therefore it is not considered on the principal question here involved. Irrespective of any rule as to burden of proof, the evidence satisfies the court that negligence is imputable to the pilot tug. This charge has not been refuted by any evidence submitted on the part of the respondents. The tugs were both owned by the claimant, the Great Lakes Towing Company. At the time of the grounding the stern tug was also under the direction and control of the Mason. The evidence shows that signals were exchanged between them relating to the management of the steamer. Fontaine, master of the Babcock, testified that when he observed that the Gratwick did not work her propeller, he blew signals to her, and later, after the grounding, in a conversation had with the master of the Gratwick, insisted that his signals should have been complied with. In these circumstances I have no hesitation in holding that the movements of the stern tug, together with those of the Mason, were directed towards the navigation of the steamer, and she was as much a part of the moving power as the pilot tug. Each tug is, therefore, reciprocally responsible for the negligence of the other. In fact, both tugs were engaged from a common owner to tow the steamer. It was immaterial which tug assumed the duties of pilot, and thereby became the controlling agent. This conclusion is based on principle, and high authority is found in support thereof. In The Bordentown (D. C.) 40 Fed. 683, Judge Brown held a tug liable which was under the control of another tug, where both belonged to the same owner, and where specific negligence was chargeable only to the tug in control. It was there held that:

"Where all the tugs employed belong to the same owner, and are under one common direction, and are engaged in the service at the time when the fault is committed, they are in the same situation * * * as a single vessel, as respects responsibility for the negligence of the common head. The words 'such vessel' in section 4283 embrace all such tugs. "

—Citing The Arturo (D. C.) 6 Fed. 308. To the same effect, see Van Eyken v. Erie R. Co. (D. C.) 117 Fed. 717; The Columbia, 73 Fed. 226, 19 C. C. A. 436.

It was suggested on argument that the Babcock is also in fault on account of slewing around the steamer's stern, and some criticism was made upon the manner in which she lapped the steamer's port quarter. The cross-examination of the witness Fontaine would seem to indicate that it was the theory of counsel for libelant that when the steamer's bow entered the current, and when the Babcock was going ahead on her port quarter, the tendency would be to throw her bow to starboard.

This manifestly would be the result of such maneuvering unless the helm of the stern tug was put to port. The evidence is not susceptible of any inference that her helm was at starboard longer than was necessary to straighten up alongside of the steamer's port quarter. She was properly steadied on a port helm, and, having been made fast to the steamer, went ahead. There was ample depth of water—approximately 50 to 75 feet—on the Gratwick's side. It is not perceived, even if her stern was shoved for a short distance toward the starboard bank, assuming this to have been the effect of the Babcock's porting, that such maneuver was in itself an act of negligence. The witness testifies that after the Babcock straightened alongside her wheel was a trifle to port, and, as the Mason was pulling the bow of the steamer in a southerly direction about two points to port, the tendency of the combined actions of the tugs was to keep the steamer from grounding. The Babcock, by lapping on the port quarter of the steamer, was performing her duties in the usual and customary way. Having lapped alongside as stated, she put her helm to port to assist the steamer in making the turn into the lake. I see no ground upon which the Babcock can be held in fault, except that she and the Mason became one vessel for the purpose of carrying out the towage contract. She must be held equally in fault with the pilot tug under the doctrine of the Bordentown Case.

The respondents have asserted limitation of liability, and in furtherance of that defense have secured an appraisal of both tugs. It is not necessary to pass upon the effect of such defense and proceedings thereunder until the ascertainment of the damages and the entry of the final decree.

My conclusion is that the injury was due solely to the negligence of the steam tugs Mason and Babcock, which were engaged in a joint venture to safely tow the Gratwick. Having failed in that duty, there must be a decree in favor of the libelant against both tugs, with an order of reference to ascertain the amount of damages.