REBSTOCK et al. v. GILCHRIST TRANSP. CO. et al.

(District Court, W. D. New York. August 26, 1904.)

No. 252.

1. TOWAGE—CARE AND SKILL REQUIRED OF TUG AND TOW.

While the obligation of an insurer, or even of a common carrier, is not imposed by law upon towing boats, they are required to have a general knowledge of the situation and its difficulties, and to exercise the care and skill of prudent navigators to avoid injury to their tow or to other vessels, while the duty rests on the tow to exercise all reasonable care to the same end, and particularly to promptly conform to and obey the signals of the pilot tug.

**2. COLLISION—MOVING AND MOORED VESSELS—CARE REQUIRED OF MOVING VESSEL.**

A moving vessel is bound to avoid collision with one at anchor or moored, when she can do so with reasonable care, having regard to her own safety; and this although the stationary vessel may be in an improper or an unsafe place.

**3. SAME—PRESUMPTION OF FAULT.**

When injury results from collision to a vessel moored outside of the channel used by navigating vessels, the presumption is that the moving vessel was in fault, and the burden rests on her to show that the accident could not have been avoided by the exercise of reasonable care and skill.

**4. SAME—STEAMER IN TOW AND MOORED VESSEL—FAULT OF TUG.**

The steamer Crystal, which had been disabled, was moored on the inside of the Erie Basin Breakwater at the port of Buffalo, some 25 or 30 feet from the channel used by vessels passing from a dock to the open lake, and opposite a bend in such channel. The steamer Tacoma, which had loaded at the docks, and was being towed out by two tugs, one ahead and one astern, failed to make the turn in the channel, but continued straight ahead, and came into collision with the Crystal. *Held*, on the evidence, that the Crystal was in a proper place; that the Tacoma was not in fault, it being shown that she was properly manned and efficiently handled, and that all signals given by the pilot tug were obeyed with reasonable promptness; but that the collision was due to the failure of the rear tug to properly assist in turning the Tacoma, which she was unable to do because she had disabled her paddle wheel through negligently striking a rock when leaving the slip.

**5. TOWAGE—TUGS IN COMMON EMPLOYMENT—LIABILITY FOR EACH OTHER'S FAULT.**

Where by a single contract with the common owner two tugs were employed generally to tow a steamer, both are liable for an injury to another vessel through a collision with the tow, resulting from the failure of either tug to properly perform the service.

In Admiralty. Suit in personam for collision.

Clinton & Thomas, for libelants.
A. J. Gilchrist and Potter & Potter, for Gilchrist Transp. Co.
Harvey L. Brown, for Hand & Johnson Tug Line.

HAZEL, District Judge. This proceeding is brought in personam to recover damages for injuries sustained by the excursion steamer Crystal on August 30, 1903, in a collision with the lake steamer Tacoma at the port of Buffalo, N. Y. On July 4th, prior to the mishap, the Crystal being disabled, was taken by her owners into shoal water alongside the Erie Basin Breakwater, which extends northeast and southwest, and is located directly opposite the Philadelphia & Reading wharf. When the accident occurred the Tacoma was being towed from the Philadelphia & Reading dock into the open lake by the steam tugs R. H. Hebard and Conneaut, while the Crystal lay aground in shallow water, moored fast by lines forward and aft to the breakwater. Vessels leaving the above-mentioned wharf for the open lake were required to head in a direct line toward the breakwater. Upon reaching a point about 25 feet from where the Crystal lay, a turn to starboard was necessary on account of the curvature of the channel. The Crystal is 185 feet over all, 48 feet beam. The steamer Tacoma, built of wood, is a long vessel, 260 feet over all, 38 feet beam. At the time of the collision she was laden with 2,616 tons of coal. Her draft

was 17 feet 5 inches forward, and 17 feet 7 inches aft. She was well equipped and manned. When the accident occurred her master was on the bridge immediately over the pilot house, while the wheelsman and engineer were at their posts, attentive to their duties. The Hand & Johnson Tug Line, corporation, owner of both towing tugs, was brought into the suit under admiralty rule 59, upon application of the owner of the Tacoma, the Gilchrist Transportation Company, which charges fault for the collision solely to the towing tugs. This, however, is denied by the tugs, which in turn attribute the blame solely to the Tacoma.

The question involved is largely one of fact, as the law applicable to the manner in which the towing tugs and the steamer were respectively required to discharge their duties is quite well settled. The duty was plainly incumbent upon the towing tugs to perform the service for which they were engaged with such caution and skill as prudent navigators ordinarily exercise in like employment. They were legally bound to avoid any obstacles in the channel or course taken by them in towing the vessel. The obligation of the insurer, or even of the common carrier, is not imposed by law upon the towing tugs. Nevertheless it is presumed that those in control of the tow are perfectly familiar with the locality, the channel, its width, the depth of water, and such obstructions or impediments to the safe passage of ships as might be avoided by reasonable care and nautical skill. In short, towing tugs are obliged to have a general knowledge of the situation and its difficulties. The Margaret, 94 U. S. 494, 24 L. Ed. 146; Transportation Line v. Hope, 95 U. S. 297, 24 L. Ed. 477; The John G. Stevens, 170 U. S. 113, 18 Sup. Ct. 544, 42 L. Ed. 969; The Temple Emery (D. C.) 122 Fed. 180; The Edmund B. Levy (C. C. A.) 128 Fed. 683. The duty rests upon a steamer in tow to exercise all reasonable care, and particularly to conform to and promptly obey the signals and directions of the pilot tug. The Tacoma was therefore bound to use such maritime skill in her navigation as would prevent damage to moving or stationary vessels having equal rights with her in the fairway. Though her movements were dominated by the head tug, she was not relieved from promptly using her own motive power when directed by the pilot tug, which was responsible for her navigation. Her speed and impetus were controlled by the tugs, subject, however, to the vigilance of her master and crew. These responsibilities do not arise from the towage contract, but are imposed by law. Hence omission on the part either of the towing tugs or the tow to skillfully and prudently perform their respective duties imposed a liability upon them. The answer of the towing tugs charges that the Crystal was negligently and improperly moored in a dangerous place, where, on account of her close proximity to the channel, she was a constant menace to vessels leaving the Philadelphia & Reading wharf. Some evidence was given at the trial to show that the Crystal was aground in an unsafe place. This defense, however, is not now pressed, and liability on the part of the Tacoma, the towing tugs, or either of them, or both the steamer and the tugs, is not seriously contro-

verted. The principle is well established that, irrespective of whether or not a vessel anchors or moors in a proper and safe place, the navigating vessel must avoid her when, with reasonable practicability, she can do so, having regard for her own safety. The Granite State, 3 Wall. 310, 18 L. Ed. 179; The Clarita, 23 Wall. 1, 23 L. Ed. 146. The rule of law above stated is practically conceded by proctor for the towing tugs. The record contains abundant evidence showing that vessels whose movements are dominated by a tug forward and another astern may be safely transported from the wharf above mentioned to the lake through the channel in question. Where does the fault for the collision rest? The breakwater at its northerly extremity, where the Crystal was fastened, has a bend or jog extending toward the west. The distance from the wharf, the starting point of the Tacoma and tugs, to where the Crystal lay aground, was about 500 feet. The water was abundantly deep and the channel sufficiently wide for reasonably safe and proper maneuvering by the tugs and tow. In these circumstances, and in event of a collision, the burden is upon the moving vessels to absolve themselves from all blame. Whenever injuries are sustained by a vessel out of the track of other vessels, the presumption arises that the fault therefor rests with the navigating vessel, unless it is affirmatively shown that the accident could not have been avoided by the exercise of human skill and precaution. The Louisiana, 3 Wall. 164, 18 L. Ed. 85; The Martin Dallman, 70 Fed. 797, 17 C. C. A. 419. The evidence shows that the Tacoma touched bottom about 30 feet before she impinged the Crystal, thus completely demonstrating that the accident did not occur in the track of other vessels, and that the Crystal was not aground in the channel or fairway, and therefore was not improperly fastened to the breakwater.

Disposition of this point having been made, it is now necessary to consider the question whether the steamer, the towing tugs, or both were in fault for the collision. Having been employed to tow the Tacoma, the pilot tug Hebard made fast by a line 35 feet long from her bow, and the Conneaut by a line from her stern. The steamer's lines from her post to the wharf were then cast off. The decided weight of evidence is to the effect that when the Tacoma slowly approached the end of the wharf, immediately after starting, she received a signal of two whistles from the pilot tug, to back her engine. This direction was promptly obeyed. Almost instantly two blasts of the whistle were again sounded, indicating that the head tug wishes the Tacoma to back full speed. This signal was also quickly complied with. When the first signal of two whistles was blown, the pilot tug stopped pulling ahead, and, intending to direct the course of the steamer to starboard, pulled her in that direction. The headway of the steamer, however, did not change. Again, after sounding the second signal, the head tug pulled full speed to starboard, but the Tacoma, on account of the absolute failure of the Conneaut to maneuver her stern to port, as will hereafter more clearly appear, did not deviate from a straight direction. The testimony is clear that swinging to port was imperative in order to facilitate a turn in the channel. The omission of the Conneaut to

132 F.—12

perform this plain duty is a fault for which she is liable, unless her failure is satisfactorily explained or excused. Because of such failure of the Conneaut, as above indicated, the steamer slowly proceeded in her headway through shallow water, colliding with and impinging the Crystal on the paddle box on the port side. Evidence given in behalf of the steamer Tacoma shows that while yet inside the slip her wheel was steadily and properly kept amidship. Her helm, which was at port a short time after leaving the wharf on receiving the backing signal, was again quickly and properly placed amidships. It is not claimed that the omission of the Conneaut to swing the steamer's stern to port was the result of inevitable accident or of vis major. In explanation it is shown that the Conneaut was practically disabled just at the instant when the steamer's stern should have been so shifted. She encountered an obstruction on the westerly side of the slip, which resulted in breaking the blades of her screw, in consequence of which she was disabled. Soon afterwards she abandoned her employment, leaving its performance to another tug. The testimony to relieve the towing tugs from blame is to the effect that the steamer was solely responsible for the collision. This charge is primarily based upon two grounds: First, that the steamer gave no attention to the backing signals of the pilot tug, or, at least, that she omitted to promptly reverse her screw when signaled so to do; and, second, that without any direction from the pilot tug the steamer accelerated her headway by working her engine while still in the slip, and just as she moved from the wharf. The proctor for the tugs also contends that, even had the Conneaut not been disabled, the collision would have happened on account of the impetus of the Tacoma, and her failure to seasonably reverse her propeller when so directed by the pilot tug. Neither of these propositions are assented to. The testimony clearly shows that the collision was caused by the negligence and carelessness of the master of the Conneaut. In disposing of the testimony to establish the fault of the steamer, it is deemed unnecessary to decide conflicting statements touching the number of signals blown by the pilot tug, or whether the Tacoma slightly accelerated her speed by working her engine. Assuming the correctness of the testimony on the part of the tugs, it nevertheless is clear that the proximate cause of the disaster was the inability of the rear tug to shift the steamer's stern to port. Assuming the truthfulness of the testimony that the Tacoma did not instantly respond to the backing signals blown to her by the tug Hebard, it is not clear from the evidence that her omission in that particular contributed to the disaster. It is quite likely that the witnesses for the tugs correctly stated their impressions of the number of times backing signals were sounded. The alarm of the master of the head tug was justified the instant he realized that the steamer did not yield her straight course despite his attempts to turn her bow to starboard. Observing that her stern did not swing to port, he properly sounded rapid signals in quick succession to indicate the imperative necessity of backing. He perceived that danger was imminent, and sought to avert it by pulling strong to starboard and then pulling aft on the line. The testimony of the tugs that, had the Tacoma given stricter attention to the signals when sounded, and had she reversed her engine, no collision would

have occurred, is not convincing. I incline to the opinion that the steamer responded to the signals with reasonable promptitude. That such signals were several times repeated is not persuasive of delay, but rather indicates a feeling of apprehension on the part of the master of the Hebard, whose prescient mind doubtless anticipated the accident. The plausibility of the testimony of the master of the Conneaut that he cried out in alarm to the mate of the steamer to quickly reverse her engine is not subject to any serious criticism or dispute. Upon the instant when the wheel was broken he was forewarned of threatened danger to the Crystal, but it is thought also that on account of her proximity to the steamer's bow the collision could not then be averted by directing the Tacoma to reverse her engine. It does not appear that the Tacoma knew the crippled condition of the Conneaut, and no claim is made that she should have dropped her anchors. Her undoubted duty was to promptly heed signals from the pilot tug, and quickly obey them. But some time necessarily elapses after the master of the steamer repeats signals to his engineer, and a few moments pass, assuming a prompt compliance with the directions given, before mechanical energy overcomes resistance and the desired momentum of the ship is attained. It is questionable whether the Hebard should not sooner have known of the mishap to the Conneaut. Information of the occurrence might have been imparted by proper signals and enabled the head tug to govern herself accordingly. Had she been apprised earlier of the accident to the Conneaut, she might possibly have resisted the steamer's straight course by instantly pulling aft on the hawser, and thus stopping her headway. According to the master of the pilot tug, he first learned of the accident to the Conneaut when her captain let go of his line, although he knew that her engine had stopped working. The evidence shows that his first movement was to pull sharply to starboard. As we have seen, the length of her hawser was 35 feet, and accordingly it was probable that the swell of the tug upon the steamer's starboard bow operated to lessen her force in that direction, especially as the steamer was at the time about 10 feet from shoal water. On the other hand, had the tug instantly known of the breaking of the Conneaut's wheel, she could have gone alongside the steamer, and pulled aft, thereby avoiding or lessening the probability of the collision. As indicated, the movements of the steamer were dominated by the tugs, and undoubtedly great caution was required on their part to turn the headway of the steamer into the channel. Careful scrutiny and comparison of the testimony has induced the conclusion that there was no such omission to obey signals by the Tacoma as to justify charging her with fault. The rule of law is that where one vessel is primarily at fault for a collision, clear proof of contributory fault by the other is required. The New York, 175 U. S. 187, 20 Sup. Ct. 67, 44 L. Ed. 126; The Chicago, The City of Augusta, 125 Fed. 712, 60 C. C. A. 480; The Transfer No. 14 (C. C. A.) 127 Fed. 305.

As previously stated, the Conneaut was disabled by striking a submerged obstruction near the jetty. It is contended that her breakdown did not contribute to the accident, because her services were not needed at this point; that her help was required in the channel, where a strong current prevailed just outside of the break-

water. This contention, however, is not satisfactorily supported by the evidence. It was clear that the help of the Conneaut at the slip was actually necessary in order to make the turn in the channel. Her disability might have been avoided by the exercise of reasonable care and diligence by her master. No such vigilance and nautical skill was exercised by the Conneaut as the law demands. Her captain was bound to know the channel and difficulties of this character. That there were rocks in the slip close to the wharf was a fact of which he had actual knowledge. It appears that on a prior occasion a similar accident happened at this identical place to a steam tug in his charge. The obstacle encountered by the Conneaut was in a towage employment over a common and ordinarily safe route. The Ellen McGovern (D. C.) 27 Fed. 868; Trans. Co. v. Downer, 11 Wall. 129, 20 L. Ed. 160. The evident want of precaution and skill demanded by the circumstances, in my judgment, is left unexplained by the evidence. The question whether both tugs are chargeable where the primary fault is attributable to the assisting tug is not free from difficulty. The towing arrangement between the master of the Tacoma and the owners of the tugs was a single contract for a joint transaction. Both the pilot and assisting tug were owned by a common owner, and the undertaking to safely transport the steamer through the channel to an agreed point in the lake, and supply all necessary assistance, rested jointly upon them. They were associated in a common enterprise. As to which of the tugs would undertake the duty of directing the movements of the steamer was not a part of the towing contract. The captain of the Tacoma did not select the pilot tug, nor indicate the details of the employment. The tugs either arranged between themselves how the tow should be handled and navigated, or the details attending the towing employment and the manner in which they were to be carried out were settled for them by their joint owner. In either case the rule of law which it is thought applies is that the owner of the tugs by the contractual agreement to safely tow the steamer rendered both tugs liable for their joint and separate faults. True, the general doctrine of the admiralty law holds the wrongdoing vessel alone liable in rem; but where all the tugs employed to perform a towing service belong to the same owner, and injury is sustained by the vessel towed through the negligence of one of such tugs, they are rightly regarded in the same situation as a single vessel. The Arturo (D. C.) 6 Fed. 308; The Bordentown (D. C.) 40 Fed. 683; The Columbia, 73 Fed. 226, 19 C. C. A. 436. See, also, The Express (D. C.) 44 Fed. 392. In the case of Drake-Maytham Steamship Co. v. Steam Tugs W. G. Mason and W. I. Babcock (recently decided by this court) 131 Fed. 632, where a similar question was involved, it was held that the movements of the astern tug, together with the movements of the pilot tug, were directed towards the navigation of the steamer, and the rear tug was as much a part of the moving power as the pilot tug. "Each tug is therefore reciprocally responsible for the negligence of the other." There, as here, both tugs were engaged from a common owner to tow a

steamer, and it was deemed immaterial which tug assumed the duties of pilot and thereby became the controlling agent. The court followed the principle enunciated in The Bordentown, supra. This same principle is thought to obtain here.

For the foregoing reasons there must be a decree in favor of the libelants against both towing tugs, with an order of reference to ascertain the amount of damages sustained by the libelant, with costs.