# THE "CONNECTICUT."

## THE "S. A. STEVENS."

## THE "OTHELLO."

The court, upon the facts set forth in the opinion, holds that two vessels were in fault, in a collision whereby a boat towed by one of them was sunk, and affirms the decree of the court below apportioning the loss between them.

APPEALS from the Circuit Court of the United States for the Eastern District of New York.

*Mr. Cornelius Van Santvoord* for the "Connecticut."
*Mr. Abraham Van Santvoord* for the "S. A. Stevens."
*Mr. Welcome R. Beebe* for the "Othello."
*Mr. Henry T. Wing, contra.*

MR. CHIEF JUSTICE WAITE delivered the opinion of the court.

The question in these appeals is, whether, on the facts found, the decree below was right. The facts in brief are as follows: "About five o'clock in the morning of Wednesday, Aug. 18, 1875, the steamer "Connecticut," assisted by the tug "S. A.

Stevens," having in tow by a hawser twenty-five boats, arranged
in five tiers of five boats each, passed around the battery from
the Hudson River to the East River in New York harbor, on
her way to the piers at or near Coenties slip in East River.
The entire length of the " Connecticut " and her tow was about
1,050 feet.   She passed between Diamond Reef and Governor's
Island, taking the centre of the river and heading towards the
Brooklyn shore.   She kept this course until she reached a point
about 1,500 feet above Diamond Reef, and about 100 feet above
the drilling-machine on Coenties Reef.   She then turned west-
wardly, across the. river, and headed towards the Wall Street
Ferry, on the New York shore.   Her own engine was stopped
when this change of course was made, but that of the " Stevens "
was kept at work.   The tide was at the time young flood in
the East River, but the last of the ebb in the Hudson River.

About the same time the " Othello," an ocean steamer, left
her dock at Pier 44 East River, a mile and three-eighths above
Diamond Reef, bound for Hull, England.   After getting headed
down the river, her pilot discovered the " Connecticut " well
on his port hand, and near Diamond Reef.   The two vessels
were then on courses which if kept would have carried them
past each other port to port 300 feet apart.   The " Othello "
was on the usual and proper course for steamers of her class
going to sea, and running at half speed, or about four knots an
hour.   She was in charge of a licensed Sandy Hook pilot, who
stood on the forward bridge.

When the " Connecticut " changed her course and headed
towards the New York shore, she gave no signal to the
" Othello," but afterwards, when she was north of Coenties
Reef, with her tow tailed its full length crosswise of the chan-
nel, and when the " Othello " was at least one-fourth of a mile
away, she did give two blasts of her whistle, indicating that
she wished the Othello to go to starboard.   At this time, owing
to the position of the tow, headed across the river as it was,
the " Othello " could not pass in safety to starboard until the
tow was got out of the way.   Under these circumstances she
kept on at half speed after the signal was given, until within
an eighth of a mile of the tow.   She then reversed her engine,
but it was too late to stop her headway before she came in

collision with and sunk the boat "Sam. Morgan," one of the
tow of the "Connecticut." Had she given attention to the
signal when sounded, and stopped her engine, no collision
would have occurred.

The tug "Stevens" was a mere helper, and subject to the
orders of the "Connecticut." The owners of the "Sam.
Morgan" sued all three of the vessels for the loss, and upon
the facts as above stated the Circuit Court gave judgment dis-
missing the libel as to the "Stevens," but holding both the
"Connecticut" and "Othello" responsible, and dividing the
loss between them. The "Connecticut" was held in fault for
not giving her signal at or before the time she changed her
course, and the "Othello" for not heeding the signal when it
was given, or taking the necessary precautions against a colli-
sion before. All parties have appealed; the libellants because
the "Stevens" was acquitted, and the "Connecticut" and the
"Othello" each because they were respectively charged with
any portion of the loss.

So far as the "Stevens" is concerned, she was clearly not to
blame. She was the mere servant of the "Connecticut," and
could exercise no will of her own. She was bound to obey
orders from the "Connecticut," and no part of the responsi-
bility of the navigation, so far as the approaching vessel was
concerned, was on her. It was not her duty to signal the move-
ments of the "Connecticut," under whose exclusive control she
was. The "Connecticut" is alone responsible for the conse-
quences of her own faults.

Without doubt the "Connecticut" had the right to go to
her landing place, and for that purpose we see no reason why
she might not have taken the courses she did. But she was
navigating in a crowded harbor with a cumbersome tow, and,
do the best she could, her presence would necessarily be an
embarrassment to other vessels passing through the channel in
which she was. It was her duty as much to notice the move-
ment of the "Othello" above, as it was that of the "Othello"
to look out for her below. Safety under such circumstances
requires all navigators to be watchful and prompt in taking
every precaution against mistakes or oversights. From the
way the "Connecticut" was heading when the "Othello"

ought first to have seen her and for some time afterwards, the "Othello" had the right to assume the vessels would pass in safety port to port. It was proper, therefore, for her to make her calculations accordingly and keep on at the speed she was going. This the "Connecticut" should also have understood; and since to put herself and her long tow across the channel would necessarily involve a change of action by the "Othello," it was certainly her duty to give prompt and timely notice of her intention to execute such a manoeuvre. Had she done this, she might have called attention to her movements and placed the obligation of keeping out of the way on the "Othello." She did not, and a collision afterwards occurred which could have been avoided. Under such circumstances the law will charge her with contributing to the loss, unless she clearly shows the contrary. It is quite probable that if the "Othello" had been on the watch and had noticed the change of course when it was begun, the collision might not have happened; but the very object of signals is to call attention to what is wanted and make sure there is no oversight. In navigating crowded harbors, while the attention of lookouts is called to one object of importance, another may pass unobserved. To avoid the consequences of accidents of this kind, a system of signals has been adopted and lawfully promulgated, which navigators are required to use when the circumstances are such as to make them necessary. To omit them is a fault, the consequences of which may fall on the delinquent party. Here, when the "Othello" first saw the "Connecticut," she was apparently expected to pass to port. The circumstances of the "Connecticut" were such as to make it necessary for her to cross the bow of the "Othello" while that vessel was coming down the river. She could not get by with her tow before the "Othello" must come to where she or the tow was, unless something was done to prevent it. Clearly it was wrong to attempt such a movement without giving notice.

That the "Othello" was in fault is equally clear. There was time after the signal was given and before the collision happened for her to have avoided it if she had acted promptly. If the change in the course of the "Connecticut" had escaped her attention before, it was all the more important that she

should be active then. Her pilot ought to have known that she could not pass in safety to starboard until the "Connecticut" had time to get the tow out of her way. She should therefore have stopped or shaped her course to get ahead of the "Connecticut," if that could be done with safety. She did neither until it was too late. Under these circumstances it was not wrong to charge her with one-half the loss occasioned by the mutual fault of herself and the "Connecticut."

Under all the circumstances we think it was right to divide the loss equally between the two defaulting vessels. The decree of the Circuit Court will be consequently affirmed, the costs of each appeal to be paid by the respective appellants; and it is

*So ordered.*