WESTERN ASSUR. Co. *v.* THE SARAH J. WEED.

(*District Court, S. D. New York.* December 28, 1889.)

1. TOWAGE—NEGLIGENCE OF TUG—PRESUMPTION.
  Though a tug is not an insurer of her tow, if the tow is run against a wharf in clear weather, negligence in the tug is legally presumed.
2. COLLISION—WITH PIER—EVIDENCE—CREDIBILITY.
  The libelant's coal-box was one of a tow of seven boats in charge of the tug S. J. W., bound around the Battery and up the East river. The tow was unwieldy, and moved through the water at the rate of only about one mile an hour, and was carried with the tide against the end of pier 45, about a half a mile above the Brooklyn bridge. The excuse of the tug was that a schooner sailing past them, on the right, prevented the tug from going as near the Brooklyn shore, a little below the bridge, as was necessary in order to avoid the effects of the cross-tide towards the New York shore. The pilot testified that the schooner, with a ferry-boat coming in the opposite direction a little later, threw him from four to six hundred feet to the westward of the usual course, and that the subsequent collision was thereby unavoidable. *Held,* that the circumstances showed that the pilot's estimate was a gross exaggeration, and that there would have been no difficulty in keeping the tow from pier 45, had the tug ported sufficiently in time. The estimates of witnesses, and statements as to the effects of tide, though uncontradicted, go for nothing, when contrary to the laws of nature and to well-known facts of navigation otherwise appearing in the testimony.

In Admiralty.
*Carpenter & Mosher,* for libelant.
*Wilcox, Adams & Macklin,* for claimant.

BROWN, J. On January 1, 1889, the box known as "N. E. T. No. 54," loaded with coal, while in tow of the steam-tug Sarah J. Weed, came in contact with the corner of pier 45, East river, and was so injured thereby as to sink shortly thereafter, and, with the cargo, become a total loss. The libelant, as insurer of the cargo, having paid the loss, brought this suit for indemnity, alleging that the collision was by the negligence of the tug. The box was one of seven taken in tow by the Weed at Jersey City, bound through the East river to ports on Long Island sound. As the weather was fair, the presumption is that the tug was negligent in suffering the tow to come in contact with the pier. The defense is that the master of the tug was thwarted and obstructed in his proper course, when just below the Brooklyn bridge—*First,* by a schooner, which came up with the flood-tide, sailing wing and wing, and ran between the tow and the Brooklyn shore, so as to prevent his getting as near to the Brooklyn shore as was necessary; *second,* by a ferry-boat, which, immediately after the schooner had passed the tug, came down the river from under the bridge, and, instead of going on the New York side of the tug, crossed the tug's bow, towards the Brooklyn side, and so continued to force the tug towards the New York shore. The tide from Buttermilk channel sets from the Brooklyn shore towards the New York shore all the way up to and above pier 45; and it is said that by the above-named obstruction the tug was so prevented from getting near Jewell's wharf, and so carried by the set of the tide towards the New York shore, that, despite anything the tug could do from that time, the

box in question was unavoidably carried over against pier 45. It is claimed that the tow was driven out of her proper course, by these obstructions, from 400 to 600 feet towards the New York shore, and so forced to pass under the bridge on the New York side of the river, instead of going 600 feet nearer to the Brooklyn shore; and that, from that position, in the strong flood, collision with the pier 45 was unavoidable. I have no doubt, from the evidence, that the tug was a boat of sufficient power, in ordinary navigation, to handle the tow, cumbersome and unwieldy as the tow was; and, if the above contention is fairly sustained, the tug should be absolved from blame. But I find it impossible to accept the theory of the defense.

As respects the ferry-boat, the evidence is that the pilot of the tug first noticed her right ahead, coming down under the bridge nearly end on, just after the schooner had passed the tug abreast of Martin's Stores; that no signal was given to the ferry-boat by the tug, and that she passed on the Brooklyn side, contrary to the expectation of the pilot of the tug. It is enough to say that, if it had been necessary to the safety of the tow that the ferry-boat should go on the New York side of the tug, there was special reason, in addition to the general obligation imposed by the supervising inspectors' rules, why the appropriate signal should have been given by the tug. Had such a signal been given, it cannot be supposed that the ferry-boat would not have observed it, and acted accordingly. So far as the course of the ferry-boat affected the navigation of the tug, the latter is to blame for not having given the necessary signal. *The Connecticut,* 103 U. S. 710, 712; *The C. H. Seuff,* 32 Fed. Rep. 237.

It is urged, however, that the change in the tow's position caused by the schooner was of itself sufficient to make it impossible for the tug to keep the tow clear of pier 45. This is founded, however, upon what is a very great overestimate by the pilot of the tug of the deviation caused by the schooner, viz., about 400 feet; and, even if the schooner had crowded the tow so much out of the way, I am satisfied there was no difficulty in overcoming it by timely porting.

The evidence leaves no doubt that the usual and proper course of tugs with such tows on the flood-tide is to proceed up the East river, steering for Martin's Stores, so as to pass within about 200 feet of Jewell's wharf, (about three or four hundred feet below Brooklyn bridge,) and from that point to steer towards pier 50, near Corlear's hook. These courses, it is stated, would bring the flood-tide on the starboard side of the tow before reaching Jewell's wharf, and on the port side, from that point, to Corlear's hook. A line from a point 200 feet off Jewell's wharf to pier 50 is shown by the chart to form an angle of not over two points with the New York shore above the bridge; and, as this course brings the flood-tide on the port side, it is evident that the flood-tide runs crosswise towards piers 45 and 50, by an angle of less than two points. As the schooner, moreover, according to the testimony, was moving through the water about five times as fast as the tow, and at the rate of about five or six miles an hour, and as the whole line of the tug and tow was but 437 feet long, and the tug did not haul to port until the schooner reached

the stern of the tow, (some witnesses say later than that,) it follows that the schooner was not more than three-quarters of a minute in passing the tug, nor was the tug hauling to port more than that time.  The schooner did not threaten the tow, but the tug only, and the only effect of the tow's porting was to let the tow sag with the tide towards the New York shore; and, if the angle of the tide across the river were fully two points, the sagging towards the New York shore during this time, (reckoning the tide at two and a half knots,) must have been only about 40 feet, instead of 400, as estimated by the master of the tug.  The tug did not pull the tow towards the New York shore, because the schooner only forced the tug to port enough to head "about straight up river."  From Martin's Stores, moreover, it is more than a half a mile to pier 45; and if the tug, before reaching Martin's Stores, had followed the usual course, so as to have run, if unobstructed, within 200 feet of Jewell's wharf, and if, from that point, she could safely steer direct towards pier 50 on the New York shore, as the testimony shows she could, thereby actually crossing the tide somewhat towards the New York shore, it is manifest that the Weed, by heading more to starboard, could, in going a half a mile, have overcome, not merely a displacement of 40 feet, but many times that displacement.

Again, the line of the usual course from off Jewell's wharf to pier 50 runs at least 600 feet distant from pier 45; and, as the flood-tide, according to the testimony, strikes boats, while on that course, upon the port side, the effect of the tide must be to set a tow still further away from the pier than that line runs, i. e., more than 600 feet from it, even without any help from a port helm.  If, instead of following the usual course from off Jewell's wharf, viz., heading two points towards the New York shore, the tug had headed two points towards the Brooklyn shore, even if she were making only a half mile per hour through the water, instead of a mile or three-quarters of a mile, as the master elsewhere estimates, and as is more probable, from the usual time to Norwalk, she must have gone 400 feet more towards the Brooklyn shore than the usual course would take her, i. e., over 1,000 feet from pier 45.  As soon as she got above the bridge, moreover, if she was much out of her usual course, there was nothing to prevent her heading three, or even four, points towards the Brooklyn shore, until she had gained her usual place in the river, which she would have done before reaching pier 45. Even, therefore, had the tow been crowded by the schooner 400 feet out of place, instead of about 40 feet, there would have been no difficulty in keeping well off from pier 45, had the tug ported sufficiently in time. The master, indeed, testifies that he did head towards the Brooklyn shore all that was prudent, and did all in his power, etc.; but what he did in this way was evidently done too late.  Such general testimony, and the various statements, also, that the tide causes, or would cause, this thing or that thing,—statements that are in part hypothetical and in part contrary to the laws of nature,—go for nothing, against the undoubted facts concerning the navigation of the East river that appear in the testimony and are familiar to the court, from which it is plain that

if the proper course was taken originally there could have been no difficulty, despite the acts of the schooner, in keeping clear of pier 45 a half a mile above, had seasonable measures been taken to do so. The libelant is entitled to a decree, with costs.