THE LLOYD H. DALZELL.
THE IMA.

THE TRANSFER NO. 10.
No. A-17685.

District Court, E. D. New York.
Dec. 22, 1947.

Burlingham, Veeder, Clark & Hupper, of New York City (E. Underwood, of New York City, of counsel), for libellant.

Haight, Griffin, Deming & Gardner, of New York City (D. L. Corbin, of New York City, of counsel), for the Ima, claimant.

Edward R. Brumley, of New York City (R. M. Peet, of New York City, of counsel), for the Transfer No. 10.

INCH, District Judge.

Libellant owns the tug Lloyd H. Dalzell, and sues the owners of the tug Transfer No. 10, and the steamship Ima, to recover for damage allegedly sustained by the said tug Dalzell on May 9, 1945, in Hell Gate. As usual, the facts are in dispute and once these facts are found the application of the law presents little difficulty.

■ The damage to the Dalzell was in the nature of a "squeeze" of the tug between the side of the steamship Ima and the side of a carfloat being towed by the Transfer No. 10. At the outset, I am satisfied that such a collision occurred. There is positive evidence by witnesses to that effect and the subsequent conduct of those in charge of the Dalzell, which is not disputed, cannot be overlooked. Such action by the master of the Dalzell in immediately following the Transfer No. 10, and complaining to her captain that the tug had been damaged and was leaking, was a natural one had there been this collision, and it seems to me incredible that the master of the tug would do this, which he concededly did, if there had been no collision which the Transfer No. 10 now claims and urges that this performance was simply an effort by the master of the tug to impose liability on the Transfer No. 10 for some old damage. Such spontaneous action by the master of the Dalzell is certainly relevant as to whether an injury had suddenly been sustained as testified to positively by witnesses. The Fin MacCool, 2, Cir., 147 F. 123.

■ Consequently, I find that the tug Dalzell was injured by being caught between the carfloat, towed by the Transfer No. 10, and the side of the steamship Ima.

Such injury and the extent thereof will be established later.

Whether such injury to the Dalzell was caused by negligence on the part of either or both of the vessels concerned remains to be determined. So far as the Dalzell is concerned, there was no negligence. Before deciding this issue, a brief statement of the facts leading up to the collision should be stated.

The steamship Ima is a motor tanker approximately 450 feet long, and was loaded. The carfloat, in question, being towed by the Transfer No. 10 was built of steel, 345 feet long by 40 foot beam. The carfloat was on the port side of the Transfer No. 10. On the starboard side was a similar float. Both floats were loaded with cars. The Dalzell, compared to these other vessels, was a small wooden tug 96 feet long.

■ Due to war regulations, then in effect, the steamship Ima, if she was going through Hell Gate, had to be accompanied by a tug. Accordingly, the Dalzell was selected and was being towed by a line from the port bow of the steamship Ima. The tug was not using her own power, she was simply being carried along by the steamship Ima in accordance with the regulations. The master of the Dalzell had nothing to do with the navigation of the steamship Ima. Baker, Carver et al v. Mathiasen Shipping Co., 2 Cir., 140 F.2d 522. The Connecticut 103 U.S. 710, 26 L. Ed. 467.

As the steamship Ima reached Hell Gate, she was in the middle of this channel. The night was clear, no wind to speak of, and the tide was last of the flood. There was about 200 feet of good water to the starboard side of the steamship line and she was proceeding at about four knots. There is an indication that this position put the tug Dalzell, hanging on her port bow, somewhat over to the left of the middle of the channel. The regulation lights on all the vessels here concerned were burning.

As the steamship Ima approached and started through Hell Gate, the Transfer No. 10 and her heavy carfloats were ob-

served about a quarter of a mile above the Hell Gate bridge somewhat close to the Wards Island shore. She was coming down against the last of the flood tide, and as she made the turn beyond the point of land at Hell Gate bridge, this flood tide would strike on the starboard bow of the starboard carfloat and tend to push her somewhat towards the middle of the channel. When the ships sighted each other the Transfer No. 10 sounded a one-blast signal which the steamship Ima answered with one-blast, thus agreeing to a port to port passing. The two ships then continued to approach each other, when it was soon seen that this passage was going to be very close, in fact there was every indication that possibly it could not be made.

Naturally, both those in charge of these two vessels blame the other for the above situation. The Transfer No. 10 claims it had been standing still, but I find to the contrary. It denies that the above signals were given, but again I find that they were given. I also find that the effect of the flood tide on the carfloats did push the carfloats somewhat nearer the middle of the channel. Those in charge of the steamship Ima claim that as they got near each other the carfloats took a sheer towards the steamship, while those in charge of the Transfer No. 10 claim that the steamship approached too close to or sheered towards the Transfer No. 10 and her floats.

In spite of these conflicting assertions it seems apparent to me that those in charge of both vessels still had reasonable time and space to carry out a more safe passage by the exercise of reasonable care, and that it was only by a last minute desperate maneuver on the part of both masters that a collision between the port carfloat of the Transfer No. 10 and the steamship Ima was prevented. Indeed so close did this carfloat pass the bow of the steamship Ima, which some testimony estimates as close as ten feet, that a more serious accident was thereby averted.

No danger signals were blown by either vessel. There was ample water to the starboard of the steamship Ima in which to move from the middle of this channel to the right where she belonged. If the Transfer No. 10, coming down against the tide knowing its possible effect on her carfloat, felt there was danger she should have blown a danger signal and waited, but I find the space to her right was sufficient, by the exercise of care, in which too proceed.

■ The blame for this faulty passage rests equally upon those in charge of both vessels.

This brings us to the tug Dalzell, being towed by the steamship Ima. When the master of the Dalzell became aware of what was about to happen, he acted promptly and if he had not, I feel sure his tug would have been sunk. He cast off his tow line, blew a danger signal and proceeded to back. Certainly both those in charge of the Transfer No. 10 and the steamship Ima must have been or should have been aware of the presence of the Dalzell, with her lights burning, being towed at the port bow of the steamship Ima. The Dalzell backed but had gotten only near the stern of the steamship Ima when the collision with her occurred. The close passage of the carfloat of Transfer No. 10 and the steamship Ima brought the heavy steel carfloat on the port side of the Transfer No. 10 sufficiently close to squeeze the Dalzell against the side of the steamship Ima, causing her to immediately spring a leak.

In my opinion, after carefully considering the credible testimony, both the Transfer No. 10 and the steamship Ima, through the negligence of those in charge, jointly brought about whatever damage happened to the tug Dalzell.

Decree for libellant against the Transfer No. 10 and the steamship Ima, jointly. Costs divided.

Submit findings of fact and conclusions of law.