**MORAN TOWING & TRANSP. CO., Inc., et al. v. EMPRESA HONDURENA DE VAPORES et al.**

No. 13277.

United States Court of Appeals Fifth Circuit.

Feb. 21, 1952.

Rehearing Denied April 1, 1952.

Selim B. Lemle, New Orleans, La., C. A. L. Johnstone, Jr., Mobile, Ala., for appellants.

Louis E. Greco, Atty., Department of Justice, New York City, Ashton Phelps, New Orleans, La., T. Massey Bedsole, C. B. Arendall, Jr., Francis H. Inge, Mobile, Ala., W. B. Spencer, Jr., New Orleans, La., Percy C. Fountain, U. S. Atty., Mobile, Ala., for appellees.

Before HUTCHESON, Chief Judge, and RUSSELL and RIVES, Circuit Judges.

JOSEPH C. HUTCHESON, Chief Judge.

These are appeals from an interlocutory decree for divided damages entered in a cause of collision in Mobile Bay, involving the "San Benito", an outgoing vessel, and an incoming flotilla made up of the tug "Moran", the tanker "Caloria", and the tug "Ladd". They present a three cornered attack upon the decree which, entered upon full findings,[1] exonerates the "Ladd" en-

---

1. As pertinent here, they are:

The Mobile Ship Channel has a depth of about 35 feet for a width of 300 feet, with sides sloping up to a depth of 19 feet or less on the outer edge of the channel. This makes the over-all width of the channel, counting the sloping sides of the channel and its bottom, approximately 600 feet. It has a length of approximately 30 miles from the mouth of the channel just below Fort Morgan to the mouth of the Mobile River at Choctaw Pass. Generally speaking, Mobile Ship Channel, as compared to many channels, is a straight one, in that there are no sharp curves or bends. There are, however, at least two points in the channel where its course slightly changes; namely, at Beacon 22, from 175 degrees (true) to 182 degrees, or outward bound, approximately 7 degrees from the southeast to the southwest; and then at Beacon 20, a little over a nautical mile below, there is a variation in the course from 182 degrees to about 187½ degrees, or approximately 5½ degrees more to the southwest, going down the channel.

The channel is dredged through the open Bay, and on dark, clear nights the beacon lights are visible for a long distance. Likewise, the lights on a ship would be visible. The evidence is that the night was dark but visibility was good at the time and place of the accident.

At 6:48 p. m. on the evening of September 23, 1946, the outgoing "San Benito" (325 feet in length with a beam of 46 feet) saw the lights of the tug "Moran", first at a distance of approximately four miles. The "San Benito" was at that time in the vicinity of Beacon 24. The "Moran" was displaying all necessary lights, showing that she had a tow astern.

This tow was a completely "dead" ship, the SS "Caloria" (with a length of 370 feet and a beam width of 51 feet), which the "Margot Moran" was towing from New Orleans to the laid-up fleet just above the city of Mobile. Immediately north of the entrance to the channel in Mobile Bay, there had been lashed to the "Caloria" an assisting tug, the "Ernest F. Ladd", of the Mobile Towing and Wrecking Company. The "Ladd" was lashed near the stern on the starboard side of the "Caloria". As the "Caloria" had no motive power and her steering mechanism was locked, the "Ladd", while pushing the tow to some extent, was serving primarily to steer the dead ship and keep her following directly behind the tug "Moran".

The length of the towing hawser was shortened after entering the channel, but evidence as to the length of the towline and the permissible length is in conflict. In a narrow channel, the shorter the hawser the safer the towing.

tirely, finds the other three vessels at fault, and assesses the damages to the "Caloria" and the "San Benito", one-half against the "San Benito", and the other half against the "Moran" and 'Caloria", divided in equal parts. Each of the three condemned, especially each member of the flotilla, finds itself hard put to it, in its attack upon the

After exchanging signals for a port-to-port passage with the "San Benito", the flotilla led by the "Moran", in order to avoid passing the outgoing ·vessel immediately in the turn of the channel at Beacon 20, slowed down to half speed. The towline, whether 400 to 600 feet as the physical facts indicate, or 200 to 250 feet as claimed by the witnesses for the flotilla, slackened as a result. Evidence of at least one witness on the "Moran" is that immediately after the collision, it was feared the towline would foul the rudder or propeller of the "Moran", as the "Caloria" was overtaking the "Moran".

The collision between the "San Benito" and the "Caloria" occurred approximately a thousand feet below Beacon 20. At this point the channel is straight again, and the collision therefore was not immediately on the curve but on a straightaway section of the channel. The "Moran" at the time of the collision, or immediately thereafter, was tightening on her hawser and straightening the course of the dead ship, which had been angling across the center of the channel.

The assisting tug, the "Ladd", was properly lighted, but lashed as she was on the starboard stern of the dead ship, it was difficult, if not impossible, for the "Ladd's" lights to be seen by a vessel approaching on the port side of the "Caloria", because the "Caloria" (370 feet in length), without ballast, was drawing only approximately six feet forward and twelve feet aft, with her deck 20 to 30 feet above the water's edge. It is undisputed that the "Ladd" took her steering orders from the pilot on the dead ship, which was manned with a "riding crew", and there is no evidence that the "Ladd" failed to respond to every order received.

The wind was from the east-northeast, at about 20 miles per hour, with an occasional gust of small force; and there was an ebb tide, which, with the twenty-mile northeast wind and an occasional but not forceful gust, had a tendency to set the "Caloria" to the western side of the channel. The "Moran" and the "Ladd" were unable prior to the collision to straighten the course of the "Caloria" and pull her away from the center or western side of the channel.

The "San Benito", after leaving her mooring at Mobile, had entered the channel at about half-speed, but immediately was put on full speed ahead, which speed she maintained until two minutes before the collision. Her crew, knowing there was supposed to be a tow behind the "Moran", failed to exercise due precaution in passing the flotilla, consisting of the two tugs and the dead ship. According to the smooth log as well as the original engine-room bell book of the "San Benito", at 6:58 her engine room was ordered "stand-by". Three minutes thereafter, still going full speed, she was ordered on half speed; and about two minutes after the order for half speed, at 7:03 simultaneously with the order "stop", the collision occurred. The evidence is that at full speed the "San Benito" would make 12 knots, and at half speed, 8 or 9 knots. Such speed was excessive in passing a tow in a narrow channel, and made it impossible so to maneuver the "San Benito" in a short space of time as to avoid or minimize the force of the collision.

After setting these findings out, the court summed them up as follows:

The flotilla, coming up the Mobile Channel, was in the center of the channel; likewise, the "San Benito", going out from the city of Mobile, was in the center of the channel, until the lights of the "Moran" and the lights of the "San Benito" were visible to each other, when both ships, under all proper rules and sensible navigation, would naturally try to avoid a collision. The fault on both sides is that neither the flotilla nor the "San Benito" began their efforts to effect a safe clearance in sufficient time before they met.

The collision occurred approximately within thirty minutes after nightfall. Although the evidence is that lights appeared on the "Caloria" at Beacon 22, after the collision, it is difficult to reconcile, as the factfinder must try to do, evidence on the one side that the "Caloria" at the time of the collision was properly lighted, with evidence on the other side that no one on the "San Benito" could see any lights on the tow, even with the aid of binoculars. It is equally difficult to reconcile the bow to bow collision of the "Caloria" and the "Benito" with the conflicting testimony that each boat was as far over on its own side of the channel as it was possible for it to be.

Pretermitting a finding as to whether

decree, to disparage the findings adverse to it without weakening those in its favor.

Bent upon obtaining complete exoneration from fault on its part and equally complete condemnation of fault on the part of the others, each, in its brief, draws with firm strokes, each magnifies, the others' faults, each touches with a light brush, indeed completely minimizes, the outlines showing, or tending to show, faults on its own part.

The "Ladd", content with the decree and asking no relief from it, moves warily. Casting no stones at the other flotilla members, it addresses itself to maintaining the innocent role assigned it by the district judge. It departs from it only to make clear that in no event can it be held ultimately liable since if, because of the fault of the "Caloria", under whose orders and directions it was, it must be held technically responsible to the "San Benito", it is entitled to judgment over against the "Caloria" for any sums adjudged against it.

In complete agreement with the "Ladd", that it may not be held to pay, the "Caloria" devotes its brief to attacking primarily the "San Benito" and secondarily the "Moran", which had the flotilla in tow.

The "Moran", in its brief, not to be outdone by the "Caloria", while giving first and preferred attention to the faults of the "San Benito", does not neglect to point out wherein the "Caloria" was to blame.

Encouraged by this division in their ranks, the "San Benito", with apparent impartiality as between the flotilla members, devotes its brief to showing that it was not at all at fault, and that for its damages it should have judgment against some, or all, of the members of the flotilla. In addition, assuming that the findings are sustained and the decree affirmed in principle, the "San Benito", citing The Eugene F. Moran, 212 U.S. 466, 29 S.Ct. 339, 53 L.Ed. 600,[2] insists that the court, having found it and two members of the flotilla at fault, erred in dividing the damages equally between it and the flotilla members instead of dividing the damages into thirds and assessing one-third against each vessel.

■ The evidence showing without dispute that the "Ladd" was employed solely as a helper tug to furnish tug power only in obedience to the orders received from those in charge of the "Caloria", and that without any negligence on its part, it carried those orders out,[3] we are in no doubt that the district judge was right in fully exonerating the "Ladd" and that the decree should be so far affirmed.

■ Neither are we in any doubt that the "San Benito" was guilty of fault contributing to cause the collision. The questions, however, whether the "San Benito"

the "Caloria" was properly lighted or not, the Court finds as a fact that there was negligence on both sides, but that the excessive speed of the outgoing "San Benito", and its failure to take proper precautions, after the "Moran's" towing lights indicated to the crew of the "San Benito" they were about to pass a tow, place more responsibility or fault on the San Benito" than there was on the incoming flotilla.

The Court further finds, however, that the flotilla was negligent, regardless of whether or not the "Caloria's" lights were burning at the time of the collision, in that, knowing they were about to pass an outgoing ship, they had failed to get the "Caloria" over on the eastern side of the ship channel. Without ballast, drawing only 6-foot forward and 12-foot aft, a completely dead ship, manned only by a "riding crew", the "Caloria", was natural-ly set to the western side of the channel by a northeast wind and ebb tide. Upon the slackening of the hawser below Beacon 20, the "Caloria" became more subject to the tidal current and the northeast wind, which gave her a further set and made it more difficult still to pull the dead ship to her side of the center of the channel.

2. Cf. The S. A. McCaulley, D.C., 116 F. 107; The Sif, 2 Cir., 266 F. 166; The Coamo, 2 Cir., 267 F. 686; The Elmhurst, 2 Cir., 78 F.2d 536; The Socony No. 123, 10 F.Supp. 341.

3. The Connecticut, 103 U.S. 710, 26 L.Ed. 467; In re Walsh, 5 Cir., 136 F. 557; Old Time Molasses Co. v. U. S., 5 Cir., 31 F.2d 963; The Adelaide, 2 Cir., 140 F.2d 522, and cases therein cited; The Crescent, D.C., 290 F. 245; The Robert Hedger, D.C., 74 F.Supp. 282.

should be held wholly at fault, or only partly so, because there was contributing fault on the part of the flotilla, and whether there was fault as between the "Moran" and the "Caloria", may not be so easily answered, for the record presents a picture of conflicts which make it difficult to draw from it the true picture of what occurred.

In these circumstances, the proper, the only safe, course for this court to pursue is, we think, not to seek to reconstruct the scene for ourselves, making our determination of fault as though we were the triers, but instead to adopt as our own the findings of the distinguished and lamented trial judge. Familiar, as he was, from a life time of residence, with the waters of Mobile Bay and with navigation thereon, and endowed by nature and experience with a fine sense of the *rusticum jus* fitting in cases of this kind where the matter may not be determined with precision, he brought to the hearing of this case, among the last tried by him, and to the study of the record made, a true and tried equipment. The findings and conclusions show a profound and careful study of the record and a thorough and complete mastery of it, and, except as to the division of damages by moieties instead of into thirds, we adopt his findings and affirm his decree. Modifying it by dividing the damages into thirds and assessing a third against each vessel, we affirm it with costs of appeal equally divided among the three.

Modified and affirmed.