OIL TRANSFER CORPORATION, as owner of the tug THE OIL TRANSCO, barge THE OTCO NEWARK and as charterer in possession of the oil barge THE DWYER NO. 105, Libellant,

v.

WESTCHESTER FERRY CORPORA-TION and the Ferry Boat THE JOHN J. WALSH, Respondents.

THE EDWARD MATTON, THE RALPH E. MATTON, INC., Claimant-Impleaded.

WESTCHESTER FERRY CORPORA-TION as owner of the Ferry Boat The John J. Walsh, Cross-Libellant,

v.

THE OIL TRANSCO and Oil Transfer Corporation, Claimant,

The Edward Matton, The Ralph E. Matton, Inc., Claimant.

United States District Court
S. D. New York.
June 6, 1958.

This suit arises upon libels in the admiralty, one filed by the Oil Transfer Corporation against the Westchester Ferry Corporation and the other by the Westchester Company against the Transfer Corporation for damages caused by a collision on the Hudson River about opposite Yonkers between the respondent's ferry "Walsh" and a barge of the libellant which damaged, not only that barge but a tug of the libellant and another barge chartered by it. After the suit had been at issue for over two years the respondent impleaded the tug, "Matton", in rem.

Macklin, Speer, Hanan & McKernan, and John C. Hart, New York City, for Oil Transfer Corporation.

638

Bighan, Englar, Jones & Houston, Donald M. Waesche, Jr., Mahan & Mason, and Frank C. Mason, New York City, for respondents.

LEARNED HAND, Circuit Judge.

For convenience I shall call the libellant's tug the "Oil Tug", the respondent's ferry, the "Ferry", and the tug libelled in rem, the "Matton". The libellant's barge I shall call the "Newark" and the barge, chartered by the libellant, the "105". The libellant made up a tow in the Staten Island Kills on January 27, 1954, making fast the "Newark" alongside the port side of the "105", so that their bows were nearly abreast of each other. However, since the "105" was about 230 feet long and the "Newark" was considerably shorter, her stern wa well forward of the stern of the "105"; and the "Oil Tug" was made fast at the stern of the "Newark", and the "Matton" at the stern of the "105", so that both tugs shared in the propulsion of the flotilla. The flotilla passed into the fairway of the Hudson in a fog, whose density varied from time to time, at times allowing both shores of the river to be seen, and at others limiting the visibility to one or two hundred feet, or even less.

The flotilla was originally under the direction of the "Matton"; but before it reached the Washington Bridge Brown, the master of the "Matton", boarded the "Oil Tug", leaving a deckhand or mate on the "Matton", which continued to push the flotilla. Thereafter, Egan, the master of the "Oil Tug", took over the command, though Brown stayed in the "Oil Tug's" pilot house, and presumably (although the testimony is not very definite) acted as an added lookout. There was no lookout on the bow of either the "Newark" or the "105", the testimony being that the pilot house was a better station.

Some time after the flotilla passed under the Washington Bridge the "Oil Tug" made out on her radar the "pip" of the "Ferry" passing from Yonkers to Alpine on the west shore, her regular service being back and forth between these two places. As is usual in fog cases both vessels—the "Oil Tug" and the "Ferry"—testified that they blew the conventional fog signals, and I do not find it necessary to accept or reject this testimony. When the flotilla had come to a point where it crossed the course of the "Ferry" on her return to Yonkers, the "Ferry" collided with the port quarter of the "Newark", slid off to starboard, struck the "Oil Tug", and did damage to both these vessels and to the "105". Neither the "Ferry" nor the flotilla had made any substantial change in direction and the flotilla did not change its speed. The "Ferry" had a lookout on the same level as the pilot house, and another forward on the bow; these had alerted the master a few moments before the collision occurred, and the "Ferry" was reversed for a short time before the collision. The visibility was at most not over 250 feet, and probably considerably less; obviously it is impossible to fix it with any degree of certainty. The excuse of the "Oil Tug" for failing to make out the "pip" of the "Ferry" on her return was that there was a good deal of ice in the western half of the river which obscured the approach of the "Ferry" as it had not done on her way westward. I have some doubt that the "pip" of the "Ferry" was not visible on her return; but I will make no finding on that issue, any more than on the issue of whether signals were blown.

There can be no doubt that the flotilla was moving at too great a speed. Arguendo, I will accept the testimony of those witnesses who said that the bow of the "105" could be seen from the pilot house of the "Oil Tug"; but her engine was making about 250 or 260 revolutions, as compared with a maximum of about 280; and the speed of the flotilla was from five to six knots, from which it would follow that it was traveling 500 to 600 feet a minute. If so, it had not more than a minute in which to take action, and even though the engines were reversed at once, it is apparent that

the flotilla could not have been stopped in time to allow the ferry to pass ahead, for the collision was near the stern of the "Newark". It is hardly necessary to add that no attempted change of direction by such an unwieldy group of vessels, navigated as a unit, could have had any beneficial effect.

The "Ferry" was crossing what she knew to be the path of many vessels, bound up and down stream. On her own testimony she was moving at a speed of seven knots (700 feet a minute) and had not reduced her speed at all. Her excuse is that, even so, she could have come to a stop in time to avoid collision. Her master so argued because she had a propeller at both ends of the vessel, so rigged that they could be rotated in unison to stop her way; so that it was as though, when reversing, she was under two propellers. I do not question that this was true, but I am unconvinced that she could have stopped within 125 feet, which, she argues, was not too great a speed, if the visibility was 250 feet. It is quite true that the generally accepted rule is that a vessel may travel in a fog at a speed that will allow her to stop within the distance of the existing visibility if she meets another vessel who can also stop within that distance. That would of course mean half the distance of the visibility if the meeting vessel was moving at the same speed, and the Ninth Circuit appears to have made this the test.[1] We have left the question open without such a fixed test:[2] and happily I am not called upon to decide the point here for the following reasons. In the first place any such doctrine should make some allowance for the interval between detection of the presence of the other vessel and setting the engines in reverse. It is not necessary to go into refinements, based as they must be upon uncertain premises, because the "Ferry" was at fault anyway. Either her lookout was faulty or her speed was too great; for

she does not suggest that it was necessary to go at seven miles an hour in order to keep her steerage way. Indeed, I cannot help saying that it requires hardihood seriously to argue that the visibility at the time in question required no slackening of speed whatever, especially in the case of a vessel, that, as I have said, was crossing a thoroughfare likely to be crowded by vessels passing at right angles.

I hold both the "Oil Tug" and the "Ferry" at fault, and the only remaining question is whether the "Matton" should be exonerated. That depends upon whether she was charged with the faults of Egan and of Brown, her own master, who, as I have said had left her and was no more than acting as a lookout. I must own that the law is not as clear as I could wish as to whether a helper tug is liable in rem for a collision between another vessel and a flotilla whose propulsion she is aiding, while she is under the direction of another tug that is in charge of the navigation. In both The Anthracite, 2 Cir., 168 F. 693, and The Perseverance, 2 Cir., 64 F.2d 340, we held that this did not excuse the helper if she contributed to the collision; but in Baker, Carver & Morrell Ship Supplies v. Mathiasen Co., 2 Cir., 140 F.2d 522, we held the opposite. I should in any event have felt bound to follow the last opinion of the Court of Appeals of this circuit; but it so chances that this result is in accord with several decisions that to my mind make it clear that our two earlier decisions were a mistaken extension of the doctrine of The China, 7 Wall. 53, 19 L.Ed. 67. In Sturgis v. Boyer, 10 How. 110, 16 L.Ed. 591, a tug was exonerated although she furnished the only motive power to navigate a ship to which she was made fast, because her master was on that ship and directed all the tug's movements. The ship alone was held, the tug being treated as a passive instrument; and her

---

1. The Silver Palm, 9 Cir., 94 F.2d 754, 759.

2. Anglo-Saxon Petroleum Co. v. United States, 2 Cir., 224 F.2d 86, Polarus SS. Co. v. The T/S Sandefjord, 2 Cir., 236 F.2d 270.

master's fault being imputed to the ship alone. This, it is true, was before The China, supra, was decided, but it was followed in 1880 by The Connecticut, 103 U.S. 710, 26 L.Ed. 467, in which again a helper tug, though she furnished the only motive power, was exonerated because she was under the orders of a steamer that was in charge of the navigation of the flotilla. The reason given, 103 U.S. at page 712, was that the helper "was a mere servant of the 'Connecticut' and could exercise no will of her own. She was bound by the orders from the 'Connecticut', and no part of the responsibility of the navigation, so far as the approaching vessel was concerned, was on her. It was not her duty to signal the movements of the 'Connecticut', under whose exclusive control she was". So too in the situation at bar, it was not any part of the duty of the "Matton" to reduce her speed, any more than it was part of the helper tug's duty to give any signal in The Connecticut, supra. Nothing could more completely imperil navigation than a division of responsibility as to either direction or speed.

In The Walsh, 136 F. 557, the Fifth Circuit quoted the decision in The Connecticut, supra, in exonerating a helper tug "lashed alongside on her starboard quarter" of a tank or oil barge that was towing a barge on a hawser, the helper being under orders from the tower. The same court relied upon the authority of The Walsh, supra, in Old Time Molasses Co. v. United States, 31 F.2d 963, where a ship was held liable which was without motive power and was being towed by a tug made fast to her port quarter. The helper was exonerated because the "navigation and handling of both vessels was in charge of the pilot of the San Pasqual" (the towed vessel) who "gave all the orders to the tug by shouting them over the side to the tug captain, or relaying them to him through the master of the San Pasqual, and they were promptly obeyed by the tug", (at page 966). In Moran Towing & Transportation Co. v. Empresa Honduras de Vapores, 194 F.2d 629, the same circuit

for a third time exonerated a helper tug that "was employed * * * to furnish tug power only in obedience to orders received from those in charge of the 'Caloria', and that without any negligence on its part * * * carried those orders out" (at page 632). Judge Campbell made a similar ruling in The Cresent, 290 F. 245.

■ There are indeed situations in which a vessel is held liable in rem though her owner is not responsible, and has been guilty of no personal fault. However, it is a fiction; and, as Holmes, J., said in The Eugene F. Moran, 212 U.S. 466, 474, 29 S.Ct. 339, 340, 53 L.Ed. 600: "a fiction is not a satisfactory ground for taking one man's property to satisfy another man's wrong and should not be extended." In The China, supra, there was no alternative to imputing the pilot's mistake to the ship's owner save allowing no remedy for an admitted wrong. Even so, it was contrary to the English law, though it has now become well establish in this country, not only in that situation, but in others, as for example, the liability in rem of a chartered vessel for faults of the charterer. The Barnstable, 181 U.S. 464, 21 S.Ct. 684, 45 L.Ed. 954. Be that as it may, in the situation here at bar the law seems now to be settled contrary to our rulings in The Anthracite, supra, and The Perseverance, supra, that where responsibility for the joint navigation of two vessels has been taken over by one of them, the other is not liable in rem if her owner is not responsible in personam, and the justification for this is perhaps even stronger when, as in the case at bar, the tug pilot has left his tug and entrusted the navigation of the flotilla to the pilot of the other tug. It is not suggested that this was contrary to the usual practise in such cases, and I can see no reason for imputing fault to the pilot who did so, or to his vessel.

A decree for divided damages will be entered holding the "Ferry" and the "Oil Tug" equally liable, and the petition interpleading the "Matton" will be dismissed. This opinion may stand for

"findings of fact and conclusions of law", under Admiralty Rule 46½, 28 U.S.C.A.: Hecht, Levis & Kahn, Inc. v. The S. S. President Buchanan, 2 Cir., 236 F.2d 627.