**Raymond WILLIS, Libellant,**

v.

**The TUGS TRAMP AND MARS, and Two Unnamed Undocumented Barges, their engines, etc., in rem, and Tidewater Construction Corporation, as owners, in personam, Respondents.**

No. 8175.

United States District Court
E. D. Virginia,
Norfolk Division.

Dec. 10, 1962.

902

Vandeventer, Black, Meredith & Martin, Norfolk, Va., proctor for libellant.

Jett, Sykes & Coupland, Norfolk, Va., proctor for respondents.

WALTER E. HOFFMAN, Chief Judge.

Libellant, the owner of the yacht MARY FRANCES—approximately 34′ 10″ in length, 10′ 2″ in width, drawing 38″ of water when light, equipped with a single screw, and powered by a 165 H.P. straight eight Chrysler engine—has instituted this *in rem* action against two tugs and two unnamed barges for damages to his yacht and the loss of use thereof. Tidewater Construction Corporation as owner of the tugs and barges has been sued *in personam*. While the tugs and barges were anchored in Adams Creek, which is a part of the intracoastal waterway connecting the Neuse River and Beaufort Inlet on the eastern coast of North Carolina, the yacht MARY FRANCES struck one of the barges which resulted in serious damage to the yacht but only minor damage to the barge.

There were five persons on the "pleasure" yacht, the libellant, two other men and two women. The men had planned a fishing trip at Morehead City some days prior to the collision. The ladies were invited at the last moment, the details of which are not pertinent to this controversy. The yacht left New Bern at 12:05 A.M., on October 8, 1960. Their course took them generally southeast down the Neuse River from New Bern to Wilkinson Point, then east northeast to the mouth of Adams Creek at the be-

ginning of the channel designated as the intracoastal waterway. The channel, which is 300 feet in width, commences at nun buoy "2"; thence south approximately 800 yards to flashing range light "4"; thence southeast past nun buoys "4A" and "6" approximately 2700 yards to flashing range light "7" where the channel bends to south southeast. The collision took place between nun buoy "6" and flashing range light "7" shortly prior to 3 A.M.

It is libellant's contention that the flotilla was anchored in such a manner that it was across the 300 foot channel, thereby entirely blocking same. He points out that the natural anchorage for such a long flotilla would have been on the east side of the channel at a point southwest of the mouth of Sandy Huss Creek in the protection of the trees on the east bank of Adams Creek; that only one Danforth anchor weighing from 85 to 90 pounds was used to anchor the entire flotilla, this anchor having been lowered from the bow of the tug TRAMP; that with the wind from the northeast the flotilla, being inadequately anchored, dragged across the channel. While these questions would, under certain circumstances, be pertinent, it does not require any extended discussion as the Court holds firmly to the belief that the divided damage rule must be applied.

The flotilla, including its anchor line, was in excess of 500 feet in length. While in navigation the tug TRAMP, approximately 65 feet in length, was the lead vessel. Lines connecting the aft end of the TRAMP and the lead barge were 30 feet in length; the identical new steel barges were each 180 feet in length, 35 feet in breadth and 10 feet in height. Approximately 2 feet was the distance between the two barges. The tug MARS is 40 feet in length and, while in navigation on this voyage, was used as a "pusher," being made up astern of the last barge to hold it into the wind and assist in going through bridges and meeting traffic. At anchor on the night in question the MARS had pulled up alongside the port side of the TRAMP and the two tugs were tied together, with the barges swinging free astern of the TRAMP.

The flotilla left Norfolk on the morning of October 6, 1960, for the purpose of delivering the newly constructed steel barges to the purchaser, Southern Plywood Company at Core Creek, North Carolina—a point approximately 9 miles beyond where the collision occurred. It was initially contemplated that the flotilla would continue on its two day trip without anchoring. The TRAMP was drawing 7½ to 8 feet, the barges approximately 12 inches forward and 20 inches aft, and the MARS about 5½ feet. The barges were admittedly not equipped for anchoring at night in violation of the Navigation Rules for Harbors, Rivers and Inland Waters, 33 U.S.C. § 180, which provides in part:

"A vessel of one hundred and fifty feet or upward in length, when at anchor, shall carry in the forward part of the vessel, at a height of not less than twenty and not exceeding forty feet above the hull, one such light [a white light in a lantern so constructed as to show a clear, uniform and unbroken light visible all around the horizon at a distance of at least one mile], and at or near the stern of the vessel, and at such a height that it shall be not less than fifteen feet lower than the forward light, another such light."

While it is the generally accepted rule that where a moving vessel collides with an anchored vessel, the burden is upon the moving vessel to exonerate herself from blame by showing that it was not within her power to have avoided the collision by taking reasonable precautions, Holcomb v. The Adam E. Cornelius, 7 Cir., 212 F.2d 719, Dahlmer v. Bay State Dredging & Contracting Co., 1 Cir., 26 F.2d 603, this burden shifts where it appears that a contributing cause of collision was the absence of statutory lights on the anchored vessel. Rogers v. Saeger, 10 Cir., 247 F.2d 758. Respondents concede that the rule of The Pennsylvania, 19 Wall. 125, 22 L.Ed. 148, is proper to consider but urge that respondents have

met the harsh burden imposed there-under.

■ When the flotilla anchored at approximately 1:30 A.M. on the early morning of October 8, each tug displayed its mast light. The preponderance of the evidence indicates that the anchor from the TRAMP was dropped at the western edge of the 300 foot channel, thus leaving the lead tug (TRAMP) about 75 feet west of the western edge of the channel after making allowance for the length of the anchor lines. The only lights displayed from the two barges were originally put in place by mate McKinney under directions of the master of the TRAMP. When the flotilla was at Coinjock, North Carolina, just prior to darkness on the prior evening, October 7, the lights were lit and remained lighted throughout that night, the following day and the night of the collision. A total of six lanterns were placed on bits on the deck of the barges. Two lanterns were located near the forward end of the lead barge, two near the forward end of the stern barge, and two near the aft end of the stern barge. In each instance one lantern was on the port side and one on the starboard side. The yacht struck the port side of the lead barge approximately amidships. According to the respondents the lanterns were about 2 feet above the deck. There is credible evidence to the effect that several, if not all, of these lanterns were burning after the collision.

As previously noted the MARS came alongside the TRAMP at the time of anchorage. The two mast lights—one from each tug—gave the impression of range lights on a trawler. Libellant so contends and denies having seen the lantern lights placed on the bits located on the barges. This is understandable as libellant's eye level in piloting the yacht was only 7' 1'' from the water level. As the unloaded barges were at a higher level it would be difficult to see the barge lanterns at a close distance. It follows that the statutory fault was a contributing proximate cause of the collision. Additionally, no anchor watch was maintained on the tugs or barges which, in itself, is improper seamanship under the circumstances here presented, but it is unnecessary to further consider the faults of the respondents as it is sufficient to rest this phase of the controversy on the statutory violation with respect to lights.

There is no difficulty in condemning the acts of libellant. Thoroughly familiar with the waters of Adams Creek, he first sighted what he believed to be the range lights of a fishing trawler when libellant was off nun buoy "2", a distance of 2500 yards [1] from the point of collision. Without diminishing his speed, which he estimated at 9 miles per hour, he proceeded along the western side of the channel according to his testimony. It is quite apparent that he gave no consideration to what he thought to be the range lights of a fishing trawler; he at no time saw any port or starboard lights from the suspected fishing trawler and dismisses this fault with the explanation that many such trawlers do not display side lights; he did not properly line up flashing range lights "4" and "7" as he approached the channel from a point considerably west [2] of the entrance thereof denominated by nun buoy "2" and thereby "cut the corner short" going into Adams Creek; he passed the two nun buoys ("4A" and "6") to his starboard at a distance estimated by him to be from 30 to 50 feet and, therefore, could not have been on the flashing range lights; he was still going 9 miles per hour at the time of impact; he used his searchlight only for the purpose of picking up buoys.

It was dark on the night in question. The witness Ditto referred to a slight misting condition, but generally visibility was good at six miles. Ditto was standing alongside the libellant during the

---

1. Libellant estimates this distance at approximately one mile.

2. Libellant estimates the distance off nun buoy "2" at 30 yards. This estimate is probably very conservative.

navigation of the yacht through Adams Creek. He likewise saw two white lights some distance away which he describes as one high light and one low light. Disagreeing with libellant, he states that the lights were initially off the starboard bow of the yacht. Presumably Ditto and libellant observed the lights at different times and if libellant's observations were made at a time when he was "cutting the corner short" in entering Adams Creek, it may well have appeared to him that the lights were east of the channel. Just prior to striking the barge Ditto saw these same lights and testified that "they were right near the boat at this point; they were practically just to the left of the boat at this time." It seems inconceivable that the libellant, with full knowledge of what he deemed to be range lights of a trawler and without at any time seeing any port or starboard lights, would proceed ahead without slackening his speed and without using his searchlight when the so-called range lights were then immediately to his left.

The yacht struck the barge at a point approximately 200 yards southeast of nun buoy "6". We think it likely that the yacht had left the channel in anticipation of cutting short the bend of the channel commencing at flashing range light "7" at the time of the impact with the barge.

In the opinion of the Court this is not a proper case for the application of the major-minor fault rule. Improper navigation of the yacht and the statutory violation as to lights on the tow were contributing causes of the collision.

█ The interesting question in this case concerns the division of damages under the mutual fault doctrine. In all there were five units—the two tugs, the two barges and the yacht. Libellant concedes that the two unnamed barges should not be condemned even though owned by the respondent, Tidewater Construction Corporation, which likewise owned the two tugs. Accepting this concession, we are called upon to determine whether the helper tug MARS was at fault.

█ It matters not that libellant has proceeded both *in rem* and *in personam*. The division of damages in admiralty is not a question of form or procedure but of substance. The Kookaburra, 2 Cir., 69 F.2d 71, 73. We look to the fault of the particular vessel and not to common ownership. The Eugene F. Moran, 212 U.S. 466, 29 S.Ct. 339, 53 L.Ed. 600.

There are, of course, authorities holding the helper tug liable. Practically all of these decisions pertain to moving collisions in which the helper tug played a prominent part in the motivation of the tug and tow. Of particular significance is The Alvah H. Boushell, 4 Cir., 38 F.2d 980, cert. den. 281 U.S. 743, 50 S.Ct. 349, 74 L.Ed. 1156. Because of the fine line of distinction drawn, it is necessary to review the facts of that case as, at first blush, it would appear to stand for the principle that the helper tug should be declared at fault. The tugs ALVAH H. BOUSHELL and C. H. HIX were commonly owned by Wood Towing Company and were engaged in moving a freighter up the Southern Branch of the Elizabeth River. The ALVAH H. BOUSHELL was the lead tug and her master gave orders to the C. H. HIX; the master of the ALVAH H. BOUSHELL being in charge of the entire flotilla. The C. H. HIX was moored to the starboard bow of the freighter. The ALVAH H. BOUSHELL, immediately prior to the collision, had cast off her lines and was falling astern of the steamship. The master of the ALVAH H. BOUSHELL was directing the navigation from the bridge of the steamship at the time of, and shortly prior to, the collision. As the steamship emerged from the opening of a bridge, her bow struck two barges being towed in the opposite direction by the tug BELHAVEN. In holding both tugs, the ALVAH H. BOUSHELL and C. H. HIX, at fault the court emphasized that the master of the BOUSHELL was, to all intents and purposes, the master of both tugs.

There is language in The Alvah H. Boushell, supra, which strongly sug-

gests that common ownership, coupled with a joint enterprise—all of which exists in the present controversy—is sufficient to impose liability upon both tugs. However, as this Court views the question, the case turned upon the tugs having a *common master*.

More persuasive, as applied to the facts of this case, is New York O. & W. Ry. Co. v. Cornell Steamboat Co., 2 Cir., 193 F. 380, where the tug TERRY, towing eight barges in two tiers of four each, ran into an impenetrable fog. She sought refuge for the night and tied to a pier, permitting her tow to trail free. The helper tug, THE HEDGES, took her orders from the TERRY, and proceeded to pull alongside the TERRY where she made fast for the night. During the early morning with the fog still persisting, the fireboat NEW YORKER, while responding to a call, struck the port barge of the tow. In cross-libel, the court held that the tug TERRY was at fault, one reason assigned being that the helper tug should have been at the end of the tow sounding her bell. From the opinion there is no suggestion that the helper tug was at fault although, admittedly, this issue is not discussed.

The decisions apparently turn upon the admiralty doctrine of the "dominant mind" as applied between tugs operating in a joint venture. The majority of cases hold that helper tugs should not be condemned for a fault not their own, where they are under the control and management of a superior tug.

In The Raleigh, 41 F. 527, and the related case, Hardy v. The Raleigh, 44 F. 781, the helper tug EASTON was under the control of the tug NIAGARA, which had in tow six tiers of canal boats. The RALEIGH collided with one of the canal boats during a dense fog at a time when the helper tug was stationed on the port side of the fourth tier of tows. No fog signals were given on board the helper tug. In holding both the NIAGARA and RALEIGH at fault, and in discussing the responsibility of the NIAGARA for the inaction of the EASTON, the helper tug, the court said (44 F. 783):

> "Inasmuch as the Niagara was a principal, and the tug Easton was her servant, the former is chargeable with fault, as between the Raleigh and herself, and the libelant and herself, if proper fog-signals were not given on board the Easton."

That a helper tug is not ordinarily responsible for a fault of navigation in the absence of an affirmative act on her part seems clear. In The Connecticut, 103 U.S. 710, 712, 26 L.Ed. 467, it is stated with respect to the liability of a helper tug:

> "So far as the 'Stevens' is concerned, she was clearly not to blame. She was the mere servant of the 'Connecticut,' and could exercise no will of her own. She was bound to obey orders from the 'Connecticut,' and no part of the responsibility of the navigation, so far as the approaching vessel was concerned, was on her."

The law is certainly not clear as to the possible liability of a helper tug in collision cases. An extended discussion of the problem is contained in an opinion by the late Judge Learned Hand who, in 1958 while sitting by designation as a district judge, decided the case of Oil Transfer Corp. v. Westchester Ferry Corp., D.C., 173 F.Supp. 637. In the main, Judge Hand places his stamp of approval upon The Walsh, 5 Cir., 136 F. 557; Old Time Molasses Co. v. United States, 5 Cir., 31 F.2d 963; Moran Towing & Transportation Co. v. Empresa Hondurena de Vapores, 5 Cir., 194 F.2d 629; and The Crescent, 2 Cir., 290 F. 245. In all of these cases the helper tug was exonerated. Cf. The Mary T. Tracy, 298 F. 528; The W. G. Mason, 2 Cir., 142 F. 913. Contra: The Bordentown, 40 F. 682; The Anthracite, 2 Cir., 168 F. 693 (criticized by Judge Hand in his decision cited supra); The Columbia, 9 Cir., 73 F. 226. The case of Rebstock v. Gilchrist Trans. Co., 132 F. 174, is readily distinguished in that the helper tug was guilty of improper navigation.

The record in this case is abundantly clear that the master of the lead tug TRAMP was in charge of the flotilla. He selected the place of anchorage; he directed the MARS to tie up alongside the TRAMP; he was charged with the responsibility of placing proper lights aboard the barges. While the master of the MARS checked the barge lights before coming alongside the TRAMP on the night in question, the responsibility for the statutory lights aboard the barges rested upon the TRAMP and her master.

Adopting this memorandum in lieu of specific findings of fact and conclusions of law, pursuant to Admiralty Rule 46½, a decree may be presented holding the yacht MARY FRANCES and the tug TRAMP equally at fault, and dividing the damages between them. To the extent that the TRAMP is liable, an *in personam* decree will be entered against Tidewater Construction Corporation.